

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-20-1995

# Harvey & Harvey v Chester

Precedential or Non-Precedential:

Docket 94-1924

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Harvey & Harvey v Chester" (1995). *1995 Decisions.* Paper 275.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/275

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 94-1924


HARVEY & HARVEY, INC.,
                              Appellant

v.

COUNTY OF CHESTER; PENNSYLVANIA DEPARTMENT
OF ENVIRONMENTAL RESOURCES; CHESTER COUNTY
SOLID WASTE AUTHORITY; SOUTHEASTERN CHESTER
COUNTY REFUSE AUTHORITY


On Appeal from the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 94-cv-03615)


No. 94-3622


TRI-COUNTY INDUSTRIES, INC.

v.

COUNTY OF MERCER PENNSYLVANIA;
MERCER COUNTY SOLID WASTE AUTHORITY;
COMMONWEALTH OF PENNSYLVANIA,
DEPARTMENT OF ENVIRONMENTAL RESOURCES


THE COUNTY OF MERCER, PENNSYLVANIA;
THE MERCER COUNTY SOLID WASTE AUTHORITY;
and COMMONWEALTH OF PENNSYLVANIA,
DEPARTMENT OF ENVIRONMENTAL RESOURCES,
                              Appellants


On Appeal from the United States District Court
For the Western District of Pennsylvania


1

(D.C. Civ. No. 93-cv-00592)


Argued:  June 6, 1995

Before: BECKER, NYGAARD, and ALITO,
        Circuit Judges.

(Filed  October 20, 1995)

JAMES McC. GEDDES, ESQUIRE (ARGUED)
PHILIP TRAINER, JR., ESQUIRE
STEVEN T. MARGOLIN, ESQUIRE
Ashby & Geddes
One Rodney Square
P. O. Box 1150
Wilmington, DE   19899

Counsel for Harvey & Harvey, Inc.,
Appellant in No. 94-1924

JOHN S. HALSTED, ESQUIRE
THOMAS L. WHITEMAN, ESQUIRE
Office of County Solicitor
2 North High Street
Courthouse, Suite 7
West Chester, PA   19380

Counsel for County of Chester,
Appellee in No. 94-1924

DENNIS W. STRAIN, ESQUIRE (ARGUED)
MARK L. FREED, ESQUIRE
Commonwealth of Pennsylvania
Department of Environmental Resources
555 North Lane
Suite 6015, Lee Park
Conshohocken, PA   19482-2233

Counsel for Pennsylvania Department
Environmental Resources,
Appellee in No. 94-1924

JAMES E. McERLANE, ESQUIRE (ARGUED)
Lamb, Windle & McErlane, P.C.
24 East Market Street
P. O. Box 565
West Chester, PA   19381-0565

Counsel for Chester County Solid

2

Waste Authority,
Appellee in No. 94-1924

JOSEPH C. CRAWFORD, ESQUIRE
Wolf, Block, Schorr & Solis-Cohen
S.E. Corner 15th & Chestnut Streets
Packard Building, 12th Floor
Philadelphia, PA   19102

Counsel for Delaware County Solid
Waste Authority,
Amicus-Appellee in No. 94-1924


THOMAS J. MAY, ESQUIRE (ARGUED)
THOMAS W. KING, III, ESQUIRE
Dillon McCandless & King
128 West Cunningham Street
Butler, PA   16001

Counsel Tri-County Industries, Inc.,
Appellee in No. 94-3622

RONALD D. AMRHEIN, JR., ESQUIRE
William J. Madden, P.C.
165 Euclid Avenue
P. O. Box 981
Sharon, PA   16146

Counsel for Mercer County Solid Waste
Authority and the County of Mercer,
Appellant in No. 94-3622

MICHAEL D. BUCHWACH, ESQUIRE
Pennsylvania Department of
 Environmental Resources
Office of General Counsel
RR#2, Mosiertown Road
P. O. Box 614
Meadville, PA   16335-8311

DENNIS W. STRAIN, ESQUIRE (ARGUED)
KRISTEN M. CAMPFIELD, ESQUIRE
GAIL B. PHELPS, ESQUIRE
Pennsylvania Department of
 Environmental Resources
Office of Chief Counsel
9th Floor, MSSOB
400 Market Street
Harrisburg, PA   17105-8464

3

Counsel for Commonwealth of
Pennsylvania, Department of
Environmental Resources,
Appellant in No. 94-3622

_____

OPINION OF THE COURT
_____


BECKER, Circuit Judge.

These appeals, briefed separately but listed together for oral argument, both present Commerce Clause challenges to municipal "flow control" ordinances. These ordinances require waste haulers, like the plaintiffs in each case here, to bring solid waste picked up within the municipal boundaries to designated landfill sites located within a state. These designated sites, in turn, usually charge "tipping fees" considerably higher than other, non-designated sites located nearby in other states. In each case we must determine whether these ordinances, which threaten haulers taking waste to nondesignated sites with fines and suspension, impermissibly discriminate against interstate commerce.

In one case Harvey & Harvey ("Harvey"), an interstate collector, hauler and processor of municipal solid waste, brought suit against Chester County, the Chester County Solid Waste Authority ("the Authority")[0] the Southeastern Chester County

_____

[0]The authority is a Pennsylvania municipal corporation established by the County Commissioners in 1984 for the purpose of operating the Lanchester Landfill.

4

Refuse Authority ("SECCRA")[0] and the Pennsylvania Department of Environmental Resources (the "DER"). It seeks to have the County's flow control plan declared unconstitutional under the dormant Commerce Clause. The district court denied Harvey's motion for a preliminary injunction. Concluding that the plan does not discriminate against interstate commerce, it held that the Pike balancing test, see Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S. Ct. 844 (1970), which Harvey acknowledged that it could not meet, would apply. (Sept. 8, 1994 Order.) Because the district court did not consider whether the Chester County flow control scheme offered out-of-state landfill operators an equal opportunity to compete for the county's waste disposal business, we vacate and remand for further proceedings.

In the other case Tri-County Industries, Inc. ("Tri-County"), a hauler of residential and commercial solid waste throughout Mercer County and in other Western Pennsylvania and Ohio counties, brought suit against the County of Mercer and the Mercer County Solid Waste Authority ("MCSWA"). It sought both a declaratory judgment that the county's flow control plan violated the dormant Commerce Clause and a permanent injunction enjoining its enforcement. The district court, concluding that the plan improperly impeded interstate commerce, granted final judgment on stipulated facts in favor of Tri-County. We hold that the district court erred in concentrating on the operation of the ordinance and concomitantly in failing to consider whether out-

---

[0] SECCRA owns the SECCRA landfill.

5

of-state interests competed on a level playing field.  Therefore, the order in Tri-County must also be vacated and remanded.

I.  FACTS AND PROCEDURAL HISTORY

A.  THE SOLID WASTE CRISIS

During the 1970s and '80s, national environmental concerns fostered stricter state regulation of waste disposal. This regulation led to a large number of landfill closures throughout the United States, creating shortages in many places and driving up landfill pricing.  See Eric S. Petersen & David N. Abramowitz, Municipal Solid Waste Flow in the Post-Carbone World, 22 FORDHAM URB. L.J. 361 n.33 (1995); see also Harvey SA 382 (Kerns); James C. Vago, Comment, The Uncertain Future of Flow Control Ordinances: The Last Trash to Clarkstown?, 22 N. KY. L. REV. 93, 98 (1995).  Pennsylvania was no exception.  It too experienced inadequate and rapidly diminishing disposal capacity for municipal waste.  See 53 P.S. §4000.102(a)(2) (legislative findings).

Waste disposal methods, ranked in descending order of environmental impact, include: source reduction and reuse, waste combustion, and landfilling.  See Vago, 22 N. KY. L. REV. at 106. Environmentally advanced, innovative waste disposal facilities can cost "in the tens to hundreds of millions of dollars to construct."  See Vago, 22 N. KY. L. REV. at 108.  State and federal environmental mandates often require the use of these new, more expensive facilities.  Petersen & Abramowitz, 22 FORDHAM URB. L.J. at *7 [n.66].  Securing long term access to disposal facilities necessary to protect the citizens' health and safety

6

"requires long-term commitments, debt and security." Id. [n.66]. Methods less protective of the environment generally have lower capital and operating costs, and thus can charge a lower tipping fee.

B.   THE RESPONSE

Until the Tax Reform Act of 1986 repealed many of the tax incentives, most waste disposal facilities were privately owned and operated. ID. at *4 [n.36]. In response to the tax changes and increased costs caused by environmental regulation, increased public ownership became necessary, shifting the financing burden to the local governments. With this burden came risk. Even where the municipal government contracts with a private operator to construct or upgrade the disposal facility, the municipality often continues to bear the risk of an inadequate waste supply through municipal guarantees. Consequently, "it is the ability of local governments to control these haulers and where they transport the collected waste that often determines the feasibility of the solid waste processing disposal programs." See Petersen & Abramowitz, 22 FORDHAM URB. L.J. at *2 [n.31].

Flow control ordinances, enacted by a number of states attempting to deal with these waste disposal crises, create a system in which waste haulers are licensed by the municipality and are directed to take the waste collected to landfills that have been designated by the county. By conditioning the haulers' licenses on their compliance, local governments can assure a certain minimum revenue at the designated sites. Flow control

both guarantees that a certain volume will be deposited and enables the operators of the designated landfill to collect a "tipping fee"[0] high enough to cover the cost of processing. Indeed, tipping fees are typically based on both the system's construction cost and the estimated amount of waste that will be deposited there annually. In some cases, the municipalities actually set the tipping fee contractually.

Given the municipalities' reliance on the higher rates in effect when the municipalities were constructing and financing these facilities, flow control ordinances have been crucial to the financial viability of these facilities in the wake of the precipitous decline of tipping fees.[0] Indeed, flow control has "been a vital economic element in supporting dozens of major waste-to-energy and landfill-based waste disposal programs involving billions of dollars in capital investment." Petersen & Abramowitz, 22 FORDHAM URB. L.J. at *2 [n.25].[0]

---

[0]The tipping fee is the price charged haulers to dump a ton of waste at a landfill.

[0]Although the waste disposal crisis had evidenced an acute shortage of environmentally sound landfill capacity, the market eventually responded to the increased price; in fact, there were so many entrants into the waste disposal market, constructing so many new facilities, that tipping fees collapsed. Thus, while landfills could contract for tipping fees between $35.00 per ton (Mercer County) and $52.00 per ton (Chester County) approximately five years ago, current spot rate tipping fees are approximately $17.50 - $30.00 per ton.

[0]Until C & A Carbone, Inc. v. Town of Clarkstown, 114 S.Ct. 1677 (1994), discussed infra, these ordinances had withstood a variety of constitutional challenges, including due process, antitrust, and Commerce Clause challenges. Petersen & Abramowitz, 22 FORDHAM URB. L.J. at *8-9 [nn.67-110]. Indeed, through the late 1980s, federal courts entertaining Commerce Clause challenges to flow control found that even flow control schemes involving export

## C. PENNSYLVANIA'S MUNICIPAL WASTE ACT

In responding to its own solid waste crisis, the Pennsylvania legislature enacted the Municipal Waste Act (the "Act") to protect the public health, safety and welfare from the short- and long-term dangers of the transportation, processing, treatment, storage and disposal of municipal waste. See 53 P.S. §4000.102(b)(3). The Act establishes a system requiring each county to plan for the long-term processing and ultimate disposal of its waste. In authorizing each county to adopt flow control ordinances, the Act explicitly set forth the policy goal of such flow control legislation:

> Authorizing counties to control the flow of municipal waste is necessary, among other reasons, to guarantee the long-term economic viability of resource recovery facilities and municipal waste landfills, to ensure that such facilities and landfills can be financed, to moderate the cost of such facilities and landfills over the long term, to protect existing capacity and to assist in the development of markets for recyclable materials by guaranteeing a steady flow of such materials. §102(a)(10).

Under the Act, counties may designate for a ten-year period the facilities at which waste generated within the county will be processed or disposed. See 53 P.S. § 4000.303(e). Such facilities do not have to be located within the county, although one provision of the Act states that "[p]roper and adequate processing and disposal of municipal waste generated within a county requires the generating county to give first choice to new

---

bans had only an incidental burden on commerce, and therefore did not discriminate against interstate commerce. ID. at *9 [n.100].

9

processing and disposal sites located within that county." 53 P.S. §4000.102(6). Each county must consider alternative facilities and programs, and "provide reasonable assurances that the county utilized a fair, open and competitive process for selecting such facilities or programs from among the alternatives which were suggested to the county." 53 P.S. §4000.502(f)(2). In addition, if a county proposes to own or operate a municipal waste processing or disposal facility, it must explain the basis for such a proposal, giving consideration to the comprehensive costs and benefits of private ownership and operation of such facilities. 53 P.S. §4000.502(m).

The facilities designated by a county, and the process by which they are chosen, must be set out in a municipal waste management plan. 53 P.S. §4000.502(f). During its preparation, the plan is reviewed by a county advisory committee made up of representatives from the county's municipalities, civic groups, and industry. The committee makes suggestions and proposes any changes it believes are appropriate. 53 P.S. §4000.503(a). At least thirty days before submitting any proposed plan revisions to the Department of Environmental Resources ("DER"), the county must submit a copy of the proposed revision to the County Advisory Committee. 53 P.S. § 4000.503(d). The county must also make the plan available for a ninety-day public review and comment period, and hold at least one public hearing on the proposed plan during this period. 53 P.S. §4000.503(c).

After adoption by the county, a plan must undergo a municipal ratification process requiring approval by fifty

10

percent of the municipalities in the county, representing at least fifty percent of the population. 53 P.S. §§4000.503(d); 504(c). The plan must then be submitted to the DER for approval, after which any party objecting to the plan may appeal to the Pennsylvania Environmental Hearing Board. If a county chooses to require that municipal waste be processed or disposed of at designated facilities by means other than contract (e.g., by ordinance), the plan must explain the basis for such a proposal and include a copy of the proposed flow control ordinance or other legal instrument. 53 P.S. § 4000.502(1).

The plan, and the list of facilities designated by the county for processing and disposal, may be revised by the county at any time but must be revised at least three years prior to the time that the remaining capacity for a county is exhausted. 25 Pa. Code § 272.251(b); 25 Pa. Code § 272.251(a)(1).

### D. THE HARVEY CASE

#### 1. The Chester County Plan

Harvey is a Delaware corporation operating in Pennsylvania, Maryland and Delaware as an interstate collector, hauler and processor, inter alia, of municipal solid waste. Harvey is a licensed hauler of municipal solid waste in Chester County, Pennsylvania.

On May 30, 1989, the Chester County Board of Commissioners appointed the Chester County Act 101 Municipal Waste Advisory Committee. The Committee evaluated six potential waste management methods in order to select the components that

11

would constitute the Chester County solid waste management system: waste reduction, recycling, waste-to-energy technology, a trash-for-ash exchange, transfer stations and landfilling. In addition, the Committee participated in four day-long site inspections of existing waste disposal and processing facilities located in Baltimore, Maryland and Chester County, Montgomery County, Philadelphia, and York, Pennsylvania. The Committee also attended a presentation on the Westinghouse resource recovery facility located in the City of Chester, Pennsylvania.

The Committee held 13 meetings between July 11, 1989, and March 20, 1990, to discuss the elements of the County's waste management plan. Although these meetings were open to the public, they were advertised only in the Daily Local News, a Westchester paper with a circulation of approximately 45,000. The Committee then prepared a draft plan, and on May 29 and May 31, 1990, conducted public hearings to entertain public comment on the draft plan. The record does not reveal how these public meetings were advertised or how many people attended. The Committee approved revisions based on that public comment. Harvey did not participate in the process, either as an advocate of an alternative site or as a commenter. The record does not contain any explanation for Harvey's absence, but it appears that Harvey did not have significant business in the County prior to 1990.

The County Commissioners adopted the updated Plan on September 25, 1990, and the DER granted its final approval on April 11, 1991. The Plan contained key components of the committee's draft plan, including the decision to designate the

12

Southeastern Chester County Refuse Authority Sanitary Landfill (the "SECCRA Landfill") and the Chester County Solid Waste Authority Lanchester Sanitary Landfill ("Lanchester Landfill") as the primary disposal sites for the County.  The County selected these two sites from among those considered because "the haulers of trash in the County had established a historical pattern of disposal at these landfills."  County Br. at 11.  In fact, the County had played a role in financing the Lanchester landfill. In 1984, the County purchased it and turned its operation over to the Authority.  The County financed the purchase with $42.55 million in Authority revenue bonds which carry a County guarantee.  After the purchase, the County guaranteed an additional $41.5 million in Authority debt, secured a $9.2 million letter of credit, and agreed to provide the Authority with an additional $9.5 million for landfill projects.

In response to concerns voiced by Committee members that the "northern tier" of the County might be adversely affected by the system proposed by the Committee (i.e., designating only the SECCRA and Lanchester landfills), the Committee voted to recommend that the Pottstown Landfill, a privately owned facility located in adjacent Montgomery County, be included in the Plan as a disposal option.[0]

Initially, the 1990 Plan did not mandate the adoption of flow control.  The DER informed Chester County during its

---

[0] The Pottstown facility was approved to receive waste only from certain areas within the county, and the amount of waste it could receive was capped at the amount deposited by the county at the facility in 1989.

13

review process, however, that it would not approve the Plan unless the County flow controlled its waste. DER letters of 3/12/91; 4/11/91; committee notes. Consequently, the County commissioners enacted a flow control ordinance on April 2, 1992. The ordinance divides the County into two service areas: the SECCRA Landfill service area and the Lanchester Landfill Service Area. Municipal waste generated in these service areas must be disposed of at the facility designated by the County to receive the waste. A certain amount of waste may also be taken to the Pottstown landfill. The terms of the ordinance permit amendment to designate other facilities and do not prohibit out-of-state facilities from applying.[0] However, the indentures of the revenue bonds and administrative agreements between the County and the Authority stipulate that the County will oppose the construction, acquisition, operation or designation of any facility that might divert revenue from Lanchester. (Committee letters to DER seeking permission not to consider additional sites for designation).

2. Procedural History

---

[0] The Ordinance defines a Designated facility as follows:

> the Lanchester Sanitary Landfill owned and operated by the Chester County Solid Waste Authority, located in Honeybrook Township, Chester County and Caernarvon and Salisbury Townships, Lancaster County; the Southeastern Chester County Refuse Authority Sanitary Landfill, located in London Grove Township, Chester County; the Pottstown Landfill owned and operated by SCA Services of Pennsylvania, Inc., located in West Pottsgrove Township, Montgomery County; or any other County designated Municipal Waste processing or disposal facility.

14

Harvey filed its complaint in the district court on June 15, 1994, challenging Chester County's flow control plan under the Federal Constitution's Commerce Clause, Art. I, § 8, Cl. 3. Harvey alleged that the regulations isolate the County from the interstate solid waste market by prohibiting the export of locally generated waste to out-of-state disposal and by similarly prohibiting the import of waste processing and disposal services from out of state. On June 27, 1994, Harvey moved for a preliminary injunction to enjoin enforcement of the relevant regulations adopted pursuant to the ordinance. After a hearing, the district court denied the motion on the grounds that Harvey had made an insufficient showing of immediate and irreparable harm. A trial date was set for September 12, 1994.

Prior to trial, the parties filed cross motions to determine the standard of review and, thus, who would bear the burden of proof. The district court granted the defendants' motion to apply the Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S. Ct. 844 (1970) balancing test since it found that the Chester County Ordinance did not discriminate on its face or in purpose or effect against interstate commerce. September 8, 1994 Order. Harvey conceded that it could not prove its case under the Pike standard and therefore stipulated to an order of final judgment Harvey appealed.

E. THE TRI-COUNTY CASE

1. The Mercer County Plan

Plaintiff/appellant, Tri-County Industries, Inc., is a Pennsylvania corporation doing business in Mercer County,

Pennsylvania.  In late 1989, the Mercer County Commissioners formed the Mercer County Solid Waste Authority ("MCSWA") to implement the County's duties under the Act.  Mercer County generates approximately 5,000 tons of municipal waste each month.

After retaining the services of an independent consultant, Mercer County decided that the best solution for this fairly small county would be to contract with a single disposal facility.  The County prepared detailed bid specifications for the needed municipal waste capacity.  The Request for Proposals ("RFP") was advertised nationwide and was obtained by twenty-three companies around the country.  Although many of these companies were located in Pennsylvania, others were located in Ohio, New York, Maryland, New Jersey, Minnesota and Louisiana.  Only four companies, including the appellee, Tri-County, submitted a bid in response to the RFP, and none of these was from outside Pennsylvania.  The successful bidder was Waste Management of Pennsylvania, the owner of a landfill in Butler County.

By its terms the process outlined by Mercer County in its RFPs does not discriminate against in- or out-of-state interests.  The RFP requirements apply equally to all disposal facilities, irrespective of their location.  Id, see also RFP 1.4(g).  The plan was submitted to DER in the fall of 1990 and approved in March, 1991.  After DER approved the Plan, MCSWA contracted with the successful bidder, and Mercer County adopted the now contested Ordinance, No. 6-1991.  The ordinance requires each hauler in the county to obtain a license and to haul

16

municipal waste generated in the county to the landfill designated in the county plan "as it may be revised from time to time." Section 3, 6-1991.

Although the Plan required Tri-County to haul the waste to the Butler facility and pay the $35 per ton tipping fee, Tri-County in fact took some of its waste to two other facilities in Ohio which charged tipping fees of only $17.20 and $27.95 per ton. Of the approximately 600 to 900 tons of waste Tri-county hauled monthly, it took 500 tons per month to the non-designated, Ohio facilities. The MCSWA notified Tri-County by letter dated March 19, 1993, that it would hold a hearing on April 15, 1993, to determine whether Tri-county's waste hauling license should be revoked for its failure to deliver all of its waste to the designated facility.

2. Procedural History

In response to this notice of hearing, Tri-County filed this declaratory judgment action in the district court seeking a declaration that the ordinance violated the Commerce Clause, and a permanent injunction enjoining its enforcement. It also moved for a preliminary injunction, and the district court held hearings on that motion, which the court then denied. After some discovery, the parties filed a joint stipulation of fact and a joint motion to enter judgment on the basis of the evidence before the district court.

In October 1994, the district court entered judgment for Tri-County on the grounds that the ordinance, by requiring that all waste generated within the county be taken to the

17

designated landfill in Butler County, operated to impermissibly burden interstate commerce.  This appeal followed.

Both of these appeals involve the district courts' choice of the applicable legal standard.  Since this involves the selection, interpretation and application of legal precepts, our review is plenary.  See Doe v. American Red Cross, 14 F.3d 196 (3d Cir. 1993).

II.  THE LEGAL FRAMEWORK

A.  THE GENERAL COMMERCE CLAUSE JURISPRUDENCE

The Commerce Clause provides that "[t]he Congress shall have Power . . . to regulate Commerce . . . among the several States." U.S. Const. Art. I, § 8, cl. 3.  "Although the Clause speaks in terms of powers bestowed upon Congress, the Court has long recognized that it also limits the power of the States to erect barriers against interstate trade."  Lewis v. B.T. Investment Managers, Inc., 447 U.S. 27, 35, 100 S. Ct. 2009, 2015 (1980).  That is, the Commerce Clause has a negative or dormant aspect which limits state authority to regulate areas where "Congress has not affirmatively acted to either authorize or forbid the challenged state activity."  Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County, 48 F.3d 701, 710 (3d Cir. 1995) (quoting Norfolk Southern Corp. v. Oberly, 822 F.2d 388, 392 (3d Cir. 1987)).  None of the parties has argued that Congress has either prohibited or authorized the flow control ordinances at issue here.[0]

---

[0]As with any dormant commerce clause issue, "[i]t is well established that Congress may authorize the States to engage in

18

Consequently, we must consider whether these ordinances violate the dormant Commerce Clause.

In considering Commerce Clause challenges, courts should "'determine whether action taken by state or local authorities unduly threatens the values the Commerce Clause was intended to serve.'" Norfolk Southern Corp. v. Oberly, 822 F.2d 388, 399 (3d Cir. 1987) (quoting Wardair Canada, Inc. v. Florida Dept. of Revenue, 477 U.S. 1, 106 S.Ct. 2369, 2372-73 (1986)). "[T]he Commerce Clause is designed to eliminate protectionist restrictions on interstate trade which typically characterize international trade, such as embargoes, quotas, and tariffs." Oberly, 822 F.2d at 399; see also New Energy Co. v. Limbach, 486 U.S. 269, 273 (1988) (explaining purpose of the clause as prohibiting "economic protectionism -- that is, regulatory

---

regulation that the Commerce Clause would otherwise forbid." See Maine v. Taylor, 477 U.S. 131, 138, 106 S. Ct. 2440, 2447 (1986). Congress can in effect overturn a Supreme Court decision simply by explicitly giving the states the authority to regulate. In her concurrence in Carbone, Justice O'Connor considered whether Congress' passage of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6941 et seq., constituted such an authorization. Although she conceded that the statute (in conjunction with its legislative history) could be read to empower states to adopt flow control ordinances, she maintained that, in order to authorize potentially discriminatory state regulation, Congress must speak explicitly and unmistakably. Carbone, 114 S. Ct. at 1691-92. Because RCRA did not constitute such an explicit pronouncement, she concluded that RCRA could not serve as the necessary enactment. In the wake of Carbone, Congress has considered legislation providing for such explicit authorization of flow control schemes. Although the Senate passed the bill known as the Interstate Transportation of Municipal Solid Waste Act of 1995, S.534, see 141 Cong. Rec. S.6728, which would have grandfathered many of the flow control ordinances enacted to finance existing facilities, the bill has not passed the House. Thus, we must consider whether the ordinances involve here survive the Carbone test.

19

measures designed to benefit in-state economic interests by burdening out-of-state competitors").  Because of that animating purpose, the Court has applied a two-step inquiry to determine whether a challenged ordinance or regulation violates the Commerce Clause.

The first step involves determining whether the ordinance discriminates against interstate commerce; discrimination is defined as the "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."  Oregon Waste Syst. Inc. v. Dept. of Environmental Quality of Oregon, 114 S.Ct. 1360 (1994).  If "a state law is shown to discriminate against interstate commerce 'either on its face or in practical effect,' the burden falls on the State to demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means."  Maine v. Taylor, 106 S. Ct 2440, 2447 (citing Hughes v. Oklahoma, 441 U.S. at 336, 99 S. Ct. at 1736); Foster-Fountain Packing Co. v. Haydel, 278 U.S. 1, 10 (1928).

But if the ordinance does not discriminate against interstate commerce either in purpose or effect, it is subjected to a balancing test whereby the statute will be upheld unless "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  Pike v. Bruce Church Inc., 397 U.S. 137, 142 (1970).  For instance, in Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 101 S. Ct. 715 (1981), the Court upheld a Minnesota statute that banned the retail sale

20

of milk in plastic jugs.  Because the statute imposed burdens on both in-state and out-of-state dairies, it was subjected only to the Pike balancing test.  After determining which standard to apply, courts must then determine whether the statute can meet the test enunciated under the appropriate standards.

        1.    Triggering Strict Scrutiny:  Discriminatory Purpose or Effect

A regulation serving a protectionist purpose is obviously invalid since a discriminatory purpose is a fortiori illegitimate.  See Philadelphia v. New Jersey, 437 U.S. at 624, 98 S. Ct. at 2535 (characterizing a statute with a protectionist purpose as virtually per se invalid).  More benign purposes, however, do not immunize the statute from the challenge since "the evil of protectionism can reside in legislative means as well as legislative ends."  Id. at 626, 2536; see also Fort Gratiot Landfill v. Michigan Department of Natural Resources, 112 S. Ct. 2019, 2024 (1992) (invalidating legislation with legitimate goals since even valid purposes may not be accomplished "by the illegitimate means of isolating [the county] from the national economy").

If a statute's purpose is not manifestly discriminatory, the court must determine "how directly [the statute] burdens interstate commerce and how evenhandedly it impacts interstate and intrastate commerce."  Stephen D. DeVito, Jr. Trucking v. RISWMC, 770 F. Supp. 775, 781 (D.R.I. 1991); see also Carbone, 104 S. Ct. at 1684 (courts look beyond explicit terms of statute to examine its practical purpose or effect);

21

Hughes, 441 U.S. at 336, 99 S. Ct. at 1736; Taylor, 477 U.S. at 138, 106 S. Ct. at 2447; Fort Gratiot, 112 S. Ct. at 2023-25 (either purpose or effect can trigger strict scrutiny); Norfolk S. Corp. v. Oberly, 822 F.2d 388, 406 (3d Cir. 1987). This court has expressed some doubt whether a showing of discriminatory effect alone could suffice. See Oberly, 822 F.2d at 400-01 n.18. But Carbone and the entire line of recent Supreme Court cases have clarified that either purpose or effect will trigger strict scrutiny analysis. We also note that where the showing of effect is weak, demonstrating discriminatory purpose buttresses the case.

As we explained, the purpose of the dormant Commerce Clause is to prevent "[s]tate and local governments [from using] their regulatory power to favor local enterprise by prohibiting patronage of out-of-state competitors or their facilities." Carbone, 114 S. Ct. at 1684; see also H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. at 537-38 ("What is ultimate is the principle that one state in its dealings with another may not place itself in a position of economic isolation."). The purpose of the dormant Commerce Clause is not to protect individual firms. In Exxon Corp. v. Maryland, 437 U.S. 117, 126, 98 S. Ct. 2207, 2214 (1978), the Supreme Court upheld a statute prohibiting a petroleum producer or refiner from operating retail service stations within the state. The Court explained:

> While the refiners will no longer enjoy their same status in the Maryland market, in-state independent dealers will have no competitive advantage over out-of-state dealers. The fact that the burden of a state regulation falls

22

> on some interstate companies does not, by
> itself, establish a claim of discrimination
> against interstate commerce.

Id. at 2214. Conversely, the one-time selection of an in-state interest does not by itself establish a discriminatory effect unless the selection confers an unreasonably long-term benefit.

This Court has recently rejected attempts to characterize all legislative schemes which award business to a successful bidder as Commerce Clause violations. Atlantic Coast, 48 F.3d at 714-15. Although we recognized that regulations of public utilities (including those that require the utility to secure its capacity within the state) are now subject to the same Commerce Clause scrutiny as non-utility statutes, we found significant precedent for local government authorities to select a single service provider in the public utility context:

> A gas or electric utility granted a franchise
> to serve the needs of all residents within a
> local area is not ordinarily required to
> commit to producing its electricity or
> securing its natural gas supply within that
> area as well. Normally, both in-state and
> out-of-state interests may, therefore,
> compete equally for the franchise award and
> the creation of a captive consumer base does
> not, under these circumstances, discriminate
> against electricity and gas generated or
> produced out of state.

48 F.3d at 715.

Carbone explicitly rejected the argument that a disputed statute would have to favor all in-state businesses as a group -- a statute may be invalid if it favors only a single or finite set of businesses. 114 S. Ct. at 1682-83. Consequently,

23

where a challenge is based on the alleged favoritism of a finite set of in-state interests (rather than all in-state businesses), it must be demonstrated that the ordinance actually favors the chosen in-state providers. That the ordinance requires the use of the selected facility, thus prohibiting the use of non-designated facilities (which may be out of state), does not itself establish a Commerce Clause violation.

B. THE SOLID WASTE COMMERCE CLAUSE JURISPRUDENCE

The Early Cases

The Supreme Court first recognized that the interstate hauling of solid waste was commerce for the purposes of Commerce Clause analysis in City of Philadelphia v. New Jersey, 437 U.S. 617 (1978). In that case, the Court struck down a New Jersey ordinance that prohibited the importation of solid or liquid waste that originated out-of-state. While New Jersey could pursue its goal of restricting access to its diminishing waste disposal facilities, it could not do so by blocking only out-of-state waste. Id. at 626-27. The Court explained that such a clear example of purposeful economic protectionism -- a virtual import ban -- is subject to a per se rule of invalidity. Id. at 625.

Despite the solid waste disposal crisis of the 1980s, the Supreme Court has invalidated each of the ordinances that attempted to ban or to levy differential surcharges on waste generated out-of-state. See, e.g., Fort Gratiot, 112 S. Ct. at 2019 (1992) (invalidating regulation prohibiting out-of state waste in the landfill unless authorized by Congress); Oregon

24

Waste Sys. Inc. v. Dept. of Environmental Quality of Oregon, 114 S. Ct. 1346 (1994) (voiding differential charge); Chemical Waste Management Inc. v. Hunt, 112 S. Ct. 2009 (1992) (same).

In response to these successful constitutional challenges, municipalities sought other means of managing solid waste disposal. Instead of attempting to limit the quantity of waste by banning or discouraging the importation of out-of-state waste, local governments opted to expand the capacity of their waste disposal facilities. They obtained the financing for these expansions by adopting flow control ordinances, which were necessary to reassure the bondholders (and the underwriters). Dormant Commerce Clause challenges to these statutes ensued.

C. CARBONE

In C & A Carbone, Inc. v. Town of Clarkstown, 114 S. Ct. 1677 (1994), the Supreme Court transposed its skepticism of waste control initiatives to flow control ordinances. Reversing the decision of an intermediate appellate court, the Court struck down Clarkstown's law requiring all nonhazardous solid waste within the town, whether or not generated in the town, to be deposited at a town-designated transfer station. The town had arranged with a private contractor to construct the designated site (which was within the town, and perforce in-state) in return for the town's commitment to deliver and pay for the processing of at least 120,000 tons of solid waste annually. At the end of a five year period, the town could purchase the facility for one dollar. Because the town's guaranteed tipping fee was higher than the cost on the private market, the town needed to adopt the

flow control ordinance to obtain the fee from the haulers and to minimize its own obligations under the guarantee agreement.

The Court found that Clarkstown's ordinance discriminated against interstate commerce by bestowing a favored status on the single waste processor within the town and by "depriving competitors, including out-of-state firms, of access to a local market," 114 S. Ct. at 1680. The Court was unpersuaded by the argument that the ordinance did not discriminate because it applied equally to in-state and out-of-state haulers. Id. at 1682 (citing Dean Milk Co. v. Madison, 71 S. Ct. 295 (1951); Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources, 112 S. Ct. 2019, 2024 (1992)). Instead, the Court regarded Clarkstown's ordinance as "just one more instance of local processing requirements" that the Court has long held invalid. Id. at 1682-83 (citing cases involving statutes that required various articles of commerce to be processed within their state of origin). The Clarkstown statute fit this mold since its terms explicitly required "all solid waste within or generated within the Town of Clarkstown . . . [to be] delivered to the Town of Clarkstown solid waste facility at Route 303, West Nyack, New York and such other sites, situated in the Town." Carbone, 114 S. Ct. at 1685 app. The statute did not mention any possibility of adding additional or alternative sites.

Because the single site designated by the ordinance was in state, the Court presumed that Clarkstown's ordinance had the "design and effect" of hoarding a local resource. Id. at 1683.

26

That Clarkstown intended the scheme to serve as a financing measure imparted it with a discriminatory purpose, according to the Court. 114 S. Ct. at 1684. Although the majority rejected Justice O'Connor's view that, to be discriminatory, a law must discriminate against out-of-state interests as a group, the Court still required that the law discriminate in favor of an in-state interest. 114 S. Ct. at 1682-83. Moreover, the Clarkstown ordinance did not provide for amendment to add other, perhaps out-of-state sites, and did not limit the period of the designation. Indeed, the town's likely ownership of the transfer station after five years seems to render the station's monopoly permanent.

Since Carbone, flow control ordinances have been subjected to searching Commerce Clause scrutiny. Some commentators have characterized the language of the Carbone opinion as exceptionally broad, and acknowledged that the decision places the "painstakingly privatized waste disposal systems" in jeopardy by denying the municipalities the principal means of support they have used to finance such facilities. Petersen & Abramowitz, 22 FORDHAM URB. L.J. at *15 [n.170]; see also Vago, The Uncertain Future of Flow Control Ordinances, 22 N. KY. L. REV. at 105, 107 (citing examples of endangered facilities); and 109 (describing impracticality of Court's municipal bond suggestion). While Carbone undisputedly sweeps quite broadly, we do not read it to establish a per se rule subjecting all flow control ordinances to strict scrutiny.

Whether strict scrutiny applies is crucial because its application is usually fatal to a challenged regulation.

D. ATLANTIC COAST

We applied Carbone in Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County, 48 F.3d 701 (3d Cir. 1995). Atlantic Coast involved a challenge to New Jersey's solid waste management regime, which was adopted in response to that state's especially severe solid waste crisis during the 1970s and '80s. Provisions of the Solid Waste Management Act, N.J. Stat. Ann. §13:1E-1 to -207 (West 1991 & supp. 1994), and the Solid Waste Utility Control Act, N.J. Stat. Ann. § 48:13A-1 to 13 (West Supp. 1994), authorized the local waste districts to adopt flow control ordinances mandating the delivery of certain wastes to designated facilities that charge higher tipping fees in order to cover operating expenses and repay revenue bonds used to finance the capital expenditures of constructing these facilities.

In addressing the challenge, we rejected the attempt to frame the issue as one of the constitutionality of the statute after the designation was made, thus refuting the contention that the challenged ordinance, which required waste to be deposited at the designated facility (which was in-state), amounted to an export ban. We found significant precedent allowing local government authorities to select a single service provider in the public utility context:

> A gas or electric utility granted a franchise
> to serve the needs of all residents within a
> local area is not ordinarily required to

> commit to producing its electricity or
> securing its natural gas supply within that
> area as well.  Normally, both in-state and
> out-of-state interests may, therefore,
> compete equally for the franchise award and
> the creation of a captive consumer base does
> not, under these circumstances, discriminate
> against electricity and gas generated or
> produced out of state.

48 F.3d at 715.

Nevertheless, in Atlantic Coast there were strong indications that in-state and out-of-state businesses did not compete equally.  The designation process set forth in the state's regulations under SWUCA and SWMA, N.J. Admin. Cod tit. 7, §26-6.6, allowed for the designation of facilities in the waste district, in another waste district or out-of-state.  The state's Department of Environmental Protection and Energy ("D.E.P.E.") admitted, however, that its goal was to secure the state's self sufficiency in non-recyclable waste disposal.  Moreover, a district wishing to designate an out-of-state facility had to certify to the Department that there were no suitable alternatives within the state, either in their waste district or in another waste district.  See N.J. Stat Ann. §13:1E-21 (1991).  Accordingly, the district court found that it was "clear that the D.E.P.E. administers the law with the specific goal that all waste generated New Jersey be disposed of within the borders of the state."  (Civ. No. 93-cv-02669) (JEI).

Rather than representing a truly open and competitive process, we found that New Jersey "designation process is intended to favor operators that have facilities already located

29

within, or those that are willing to construct a facility within, the state." 48 F.3d at 708. Indeed, in rejecting the argument that out-of-state businesses could compete for designation, we explained that the New Jersey regime, with its "core" goal of New Jersey's waste self-sufficiency in five years, assured that "out of state facilities do not compete on anything approaching a level playing field." 48 F.3d at 713. In interpreting Carbone, therefore, Atlantic Coast did not consider all flow control ordinances to be per se discriminatory (and consequently subject to strict scrutiny analysis). Instead, we focused on the process, and invalidated a scheme in which the process discriminated against out-of-state facilities.

          E.   OTHER CIRCUITS

          Other circuits applying Carbone have upheld flow control ordinances. The Tenth Circuit held that an Oklahoma county's scheme requiring operators of industrial waste disposal sites to obtain conditional use permits did not discriminate against interstate commerce. See Blue Circle Cement v. Board of County Comm'rs, 27 F.3d 1499, 1512 (10th Cir. 1994) (remanding for the application of the Pike test). The ordinance did not discriminate against the out-of-state plaintiff seeking to operate a hazardous waste fuel (HWF) conversion facility since "[i]ts site conditions apply equally, regardless of the origin of the HWF's being burned and it confers no advantages on in-state

entities seeking to store, treat, recycle, or dispose of HWFs as against out-of-state firms."  Id. at 1512.[0]

F.  SUMMARY OF APPLICABLE PRINCIPLES

From our review of the caselaw, we derive the following relevant principles.  Local government acts that categorically favor all in-state providers clearly violate the dormant Commerce Clause.  Acts that concentrate waste hauling or processing business in the hands of a single or finite set of in-state providers are also suspect from a dormant Commerce Clause perspective.  Although such regulations ultimately prohibit the transport of solid waste to nondesignated sites -- which, in these cases, amounts to a prohibition on the export of waste to other states -- the fact that the designated sites happened to be in-state does not, standing alone, establish that the flow control schemes discriminate against interstate commerce.  To determine whether these flow control schemes actually discriminate against interstate commerce (triggering strict scrutiny analysis) the court must closely examine: (1) the designation process; (2) the duration of the designation; and (3) the likelihood of an amendment to add alternative sites, for signs that out-of-state bidders do not in practice enjoy equal access to the local market.

---

[0]In Kleenwell Biohazard Waste v. Nelson, 48 F.3d 391, 398 (9th Cir. 1995), the Ninth Circuit held that Washington's scheme requiring solid waste haulers to obtain certification from a state commission did not discriminate against out-of-state interests.  The Washington scheme did not, however, designate a landfill or require that certified haulers use a particular facility and thus did not present the same issue we confront today.

These precepts are fully consistent with the precedents in this area. While Carbone clearly has broad application, it did not establish a per se rule subjecting all flow control ordinances to strict scrutiny. The Court's discussion reveals that its decision was not based on the fact that waste was required to be processed at a single plant. Instead, the Court regarded Clarkstown's ordinance as "just one more instance of local processing requirements" that the Court has long held invalid. Id. at 1682-83 (citing cases involving statutes that required various articles of commerce to be processed within their state of origin). And in interpreting Carbone, this Court has focused on the process of selecting waste service providers rather than on the effect of the regulation once a provider or providers have been chosen. See Atlantic Coast, 48 F.3d at 713. That a flow control ordinance requires all waste to be processed or deposited in state for some fixed period of time, therefore, does not necessarily violate the dormant Commerce Clause unless out-of-state businesses did not compete on an even playing field for the designation. If it were the designation of a single site that offended the Commerce Clause, then a scheme "hoarding business" for an out-of-state interest would be invalid even though the scheme in no way advanced a protectionist purpose or effect.

While the process in Atantic Coast clearly favored in state bidders, not every process used to select a single provider is necessarily infected with this same parochialism. We believe, in fact, that a local authority could choose a single provider --

without impermissibly discriminating against inter-state commerce -- so long as the selection process was open and competitive and offered truly equal opportunities to in- and out-of-state businesses. See discussion of Exxon and Atlantic Coast, supra at 24 & 30-31.

The burden of showing that the statute discriminates rests on the party challenging the statute. See, e.g., Hughes v. Oklahoma, 441 U.S. 322, 336 (1979) ("The burden to show discrimination rests on the party challenging the validity of the statute . . . ."); J. Filiberto Sanitation, Inc. v. Dept. of Environmental Protection, 857 F.2d 913, 919 (3d Cir. 1988) ("As the party attacking the statute, Filiberto bears the burden of showing discrimination"). To make this showing, a plaintiff challenging a designation scheme like the one at issue here must show that the designation process favors, either purposely or in effect, in-state sites. We recognize the difficulties of ascertaining whether long-term designations are really necessary, and whether the selection criteria are truly objective. Courts considering flow control schemes where only in-state facilities are designated must therefore keep this difficulty in mind when scrutinizing the allegedly discriminatory criteria proffered by challengers. Admittedly, we cannot cite any authority for the sort of inquiry we will describe, but this area of law is nascent, and we are constrained to draw upon notions of reasonableness to effectuate the relevant policies.

As discrimination may reside in either purpose or effect, a number of things can demonstrate that the designation

33

process impermissibly favored in-state interests/bidders. Certainly, there could be direct evidence of favoritism, as there was in Atlantic Coast, or corrupt payments. Or a seemingly neutral bid specification with an entirely legitimate purpose, such as a specified proximity requirement, may have the effect of giving in-state interests an advantage. For instance, the incentive to protect a municipal investment, exemplified by the attempt in Carbone to minimize the town's exposure under the guarantee agreement, would impermissibly skew the process against a new -- potentially out-of-state -- provider attempting to gain designation in order to compete with an existing in-state facility.

Moreover, there may be aspects of a flow control regime that appear to be so unnecessarily restrictive that a factfinder reasonably could conclude that their real purpose was to entrench the local interest once selected by a neutral designation process. Examples of such regulations are excessively long periods of exclusive service rights under the designation, or an absence of any allowance or the absence of any real possibility for the designation of additional, potentially out-of-state sites.[0]

---

[0]There are, of course, others. While we are reluctant to pass on the reasonableness of the long-term tipping fees contracted for by some municipalities implementing flow control, there may be cases where the contractual fee is so much higher than both the spot rate and the rates prevailing at the time of contract that one could conclude that the designation was being used as a vehicle to deliver an extraordinary profit to a favored facility.

34

The governmental defendants can rebut a putative showing of discrimination by presenting evidence demonstrating that the designation process was open, fair, and competitive, i.e., determined by objective criteria which do not have the effect of favoring in-state interests. Courts should require that government defendants produce substantial evidence in order to rebut the plaintiff's showing. Such evidence might include bid solicitation, selection criteria, evaluation of bidders, et alia, but such evidence alone may be insufficient to prove the flow control scheme's neutrality. The government defendants in these cases might also present additional evidence, such as statistical evidence or expert testimony, demonstrating that different aspects of the designation process are as neutral to out-of-state interests in practice as they appear on their face. Municipalities that have adopted flow control schemes would also be wise to demonstrate that the goals of the designation process included capacity assurance and the protection of the public health and safety.

If the government defendant cannot satisfactorily demonstrate that the ordinance does not have the purpose or effect of discriminating against interstate commerce, it must then prove that the ordinance survives strict scrutiny analysis (in order to have the ordinance upheld). This comports with other dormant Commerce Clause contexts where, once a plaintiff has shown that a law or regulation discriminates against interstate commerce, "the burden falls on the State to demonstrate both that the statute 'serves a legitimate local

purpose,' and that this purpose could not be served as well by available nondiscriminatory means." Maine v. Taylor, 477 U.S. at 138, 106 S. Ct. at 2447 (quoting Hughes v. Oklahoma, 441 U.S. 322, 336, 99 S. Ct. 1727, 1736 (1979). Of course, if the defendants succeed in the first showing, then the ordinance would be subject only to the Pike balancing test under which the plaintiff must prove that "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." See Pike, 397 U.S. at 142, 90 S. Ct. at 847.[0]

V. APPLICATION TO THESE CASES

A. HARVEY

In granting judgment for Chester County, the district court determined that the Ordinance "does not discriminate on its face nor is the primary purpose or effect" to discriminate. The court, however, demanded too much, for in order to find a dormant Commerce Clause violation there is no requirement that discrimination must be the "primary" purpose or effect. This erroneous legal conclusion would alone mandate that we set aside the judgment and remand for consideration under the proper legal standard. Moreover, the current record creates the strong impression that the Chester County process was not sufficiently open, and that there was no real potential for amendment that

---

[0] We assume that these flow control ordinances will always have a sufficient effect on interstate commerce to warrant at least some Commerce Clause scrutiny.

36

could offer out-of-state bidders a fair chance at Chester County's business.[0]

In combination, Pennsylvania's Act 101 and the Chester County ordinance require that waste from within Chester County be disposed of at one of the County's designated sites, all of which are located within the Commonwealth. Harvey contends that, because the County's Plan, adopted pursuant to the flow control ordinance, specifies only the Lanchester, SECCRA, and Pottstown facilities, the entire flow control scheme facially discriminates against inter-state commerce. We disagree. As in the public utility context described supra, local governments have the capacity, in the practical exercise of their police powers, which are at their strongest in the health and safety area, to contract with specific businesses to provide certain services. Furthermore, to accept Harvey's contention that a plan designating in-state sites facially discriminates against interstate commerce would require a local government to select out-of-state sites, irrespective of their merits, in order to withstand Commerce Clause scrutiny. This result plainly cannot prevail.

---

[0] We have considered the joint motion of defendants (Chester County, the Authority, the Commonwealth of Pennsylvania, and the DER) to strike portions of appellant's opening brief and appendix. Essentially, the defendants argue that Harvey has relied on different excerpts from various depositions, agreements and exhibits than it did in the district court. But because the parts, albeit different parts, of the disputed materials were submitted to the district court, the materials were incorporated by reference into the record in their entirety. Thus, the Motion will be denied.

Also contrary to Harvey's assertions, this case does not resemble those cases involving export or import bans (we will refer to the alleged violation here as a ban on the importation of waste disposal site services) since those cases explicitly banned out-of-state interests from participating in the local market because they were from outside the state. See, e.g., Philadelphia, 437 U.S. at 624; Fort Gratiot, 112 S. Ct. at 2024. We do not mean to suggest that the ordinance must have the purpose of discriminating against inter-state commerce, for it is well settled that ordinances which have the effect of discriminating also violate the Commerce Clause. See Carbone, 114 S.Ct at 1684; Fort Gratiot, 112 S. Ct. at 2023-25. But if effects are the purported basis for unconstitutionality, the statute must have the consistent effect or the inherent bias of favoring one or more in-state interests.

Harvey might still prevail if it can demonstrate that the Act or the Ordinance discriminates through some aspect of the selection process which favors in-state bidders for the designation because they are local facilities. Although Act 101 does not require flow control ordinances, it does offer guidelines to those localities which adopt them. We will therefore examine both the Act and Chester's Plan, as implemented by its ordinances.

### 1. Act 101

The Act does not mandate flow control ordinances; it only authorizes counties to adopt them. SA 385; §303(a)-(e). One of the County's witnesses claimed that Pennsylvania's Act 101

38

directs the county to use a fair, open and competitive process to select its providers, see 53 P.S. §4000.502(f)(2) (requiring plan to describe alternative facilities considered and "provide reasonable assurances that the county utilized a fair, open and competitive process for selecting such facilities or programs from among alternatives"); 53 P.S. §4000.503(c) (requiring the county to make the plan available for a 90-day public review period and hold at least one public hearing on the proposed plan); 53 P.S. §4000.502(d) (providing that when additional disposal capacity is needed, "the county shall give public notice of such a determination and solicit proposals and recommendations regarding facilities and programs to provide such capacity").

While these provisions of the Act suggest an open process, other provisions do not seem so neutral. One provision, for example, provides that "[p]roper and adequate processing and disposal of municipal waste generated within a county requires the generating county to give first choice to new processing and disposal sites located within that county." 53 P.S. §4000.102(6). Another provision states that County waste management plans "shall identify the general location within a county where each municipal waste processing or disposal facility . . . will be located and . . . explain how the site will be chosen. For any facility that is proposed to be located outside the county, the plan shall explain in detail the reasons for selecting such a facility." 53 P.S. §4000.502(g) (emphasis added). By imposing an incremental administrative burden on counties attempting to designate a facility outside its borders,

39

these provisions clearly express a preference that counties use sites within their borders.  While not as strong an expression of favoritism, the Act's preference for in-county sites resembles the policies we found offensive in Atlantic Coast.

Although Pennsylvania's policy preferences evidence some intent to favor in-state sites, Harvey did not attack the Act directly and did not rely upon any of these passages of the Act.  With the provisions nonetheless in mind, we will therefore proceed to examine the County's implementation of the waste disposal planning mandate to determine whether Chester County officials in fact favored sites within the county.

### 2.  The Plan

We do not doubt that the county's legitimate intention to comply with the Act[0] motivated its adoption of flow control.  But legitimacy of purpose generally does not end our inquiry.  If the manner in which the county implemented its flow control system, particularly the process used to designate the ten year providers, favored in-county interests, then the flow control ordinance has the effect of discriminating against interstate commerce and must be subject to the strict scrutiny test enunciated in Taylor and Philadelphia.

Chester County does indeed appear to have favored in-county interests.  It is true that one cannot draw any inferences about the equity of the designation process from its description

_____

[0]There are indications that the state authority, the DER, was going to withhold approval of the plan unless it included flow control. SA331.

40

in the Chester ordinance.  Section 2 of the ordinance originally defined "designated facilities" as "those processing or disposal facilities designated by resolution of the Chester County Board of Commissioners adopted in accordance with the Plan." (SA 252).  The lateear whether the Committee actually considered designating those sites or whether it was simply investigating an alternative method of waste disposal.  If the Committee never considered designating those sitesy."

Other provisions of the Plan, however, do reveal a bias for designating in-county sites.  For instance, the Plan provides that "The County will consider developing an in-County resource recovery facility" (emphasis added), if in-County landfill capacity becomes unavailable, or if the County cannot secure sufficient capacity outside the county.  These particular provisions of the Plan reveal that the Committee intended to keep the waste disposal business within the County.

Although the county was not favoring all in-County sites simply because they were in state (thus not favoring in-County sites as a group), this does not preclude a finding of impermissible discrimination.  Establishing discrimination requires only a demonstration that out-of-state interests did not compete for designation on a level playing field.  We believe that the County's economic interest in keeping the business at home and the Plan's legislative history, see, e.g., A135, suggest that the designation process did not offer a level playing

41

field.[0]  That the county sought only to provide environmentally safe waste disposal capacity, a legitimate exercise of its police powers, would not save the Plan: as we have explained, "the evil of protectionism can reside in legislative means as well as legislative ends."  Philadelphia, 437 U.S. at 627.

### a. Designation

Harvey claims that, in preparing the Plan, "the County never considered any out-of-state landfill for designation or allowed any such facility to submit a bid to accept County waste."  If supported, these allegations would establish that out-of-state sites did not compete on a "level playing field" and that the process had the effect of discriminating against interstate commerce.  At least some of these accusations are not borne out by the record, however.  The County included a description of the Waste Advisory Committee's consideration of alternative sites, one of which was in Baltimore, Maryland, and one in Philadelphia.[0]

---

[0]Although the county's pre-existing economic interest in the designated landfill creates the incentive for the county to favor these in-state sites in violation of the dormant commerce clause, not every case where the county has an economic stake in the designated site will result in such a violation.  The county could, for example, have selected the designated sites in an open, fair and competitive process, and then made investments in improving those sites.  The length of the period of designation would, of course, have to be related to the amount of the investment.

[0]It is not clear whether the Committee actually considered designating those sites or whether it was simply investigating an alternative method of waste disposal.  If the Committee never considered designating those sites, that would increase the impression that the process favored the in-state facilities.

But other aspects of the County's process are less reassuring. While the Committee met 13 times to discuss various aspects of the plan and evaluate the alternative waste disposal strategies and facilities (app 23), and while these meetings were supposed to be open to the public, they were advertised in only one small, local newspaper, the Daily Local News. Public hearings to review the draft Plan were held on May 29 and 31, 1990, but there is no reason to believe that those meetings were any better publicized.[0] In the end, the Committee selected the two in-county sites that already served as the primary disposal sites for the County's waste. The Pottstown facility was designated as an alternate only after the process was concluded (as the result of two letters and public comment received during the review and comment period). Two factors in particular create the impression that parochialism rather than competition determined the outcome of the designation process: (1) that established local businesses won the designation; and (2) that the Pottstown site was designated as an alternative after the process had concluded -- a status that appears to have been specially created for this situation.

b. Escape Valves: Amendment

---

[0]Of course, if the County can demonstrate on remand that the relevant out-of-state market participants knew about the designation opportunity anyway -- and perhaps word of such proposals travels quickly through the trade grapevine -- that would rebut the evidence about the lack of adequate publicity and tend to show that the process was open. Similarly, if the County could demonstrate that the publication was a specialized trade journal which effectively notified the relevant market participants despite its relatively small circulation, that would also refute evidence that the bidding process was closed.

43

The capacity to amend the Plan in order to add additional sites does not appear sufficiently to mitigate the effect of having chosen the established in-state interests. If the amendment process were open and fairly liberal, it could conceivably save the initially discriminatory effect of "home cooking." But the amendment process in Chester's Plan is quite constrained: additional sites can only be designated if the existing facilities have insufficient capacity, are unable to obtain expansion permits, develop unforeseen environmental problems which preclude continued use of those facilities, or are subject to regulatory changes which affect their capacity or preclude their continued use. See Chester County Selection and Justification of Municipal Waste Management Program § 6.3.4. The prospect that an out-of-state site could gain designation through the amendment process is too remote to equalize the opportunity for out-of-state businesses, which were initially shut out, to participate in the local waste disposal market.

There were, moreover, indications that the Committee had no intention of designating additional facilities. First, one of the Committee members wrote to the DER specifically requesting guidance on whether the County was "obligated to review each request formally" since it did "not wish to designate additional disposal facilities at this time." Second, the Authority had covenanted in the 1990 bond indenture not to "construct, acquire or operate" any waste processing plants,

44

structures, facilities or properties which would compete for revenues with those already designated by the Authority.[0]

### c. Economic Interest

It also appears that Chester County may have had an economic motive for favoring certain in-county sites. The County had purchased the Lanchester landfill through the issuance of $42.55 million in revenue bonds. (b.8). The County has guaranteed an additional $41.5 million in Authority debt, secured a $9.2 million letter of credit, and committed to provide the Authority with an additional $9.5 million for landfill projects. That the flow control ordinance was not adopted until after the county had financed the authority's purchase of SECRA does not lessen its incentive to assure the Authority's revenues and thereby shield its exposure under the guarantee agreement.

Flow control certainly would be an effective means to achieve this end: designation conferred on the three selected sites the capacity to charge 200-300% of the prevailing tipping fees at alternative sites. Lanchester charged $57 per ton and SECCRA charged $52 per ton. The Baltimore facility, by contrast, charged only $34 per ton. Furthermore, the legislative history of the flow control scheme suggests that this financial pressure did indeed play a role. The County's Administrative Agreement with the Authority also reflects this pressure. In that

[0]Despite this documentary evidence indicating that there was little chance of an amendment, Chester County's counsel represented at oral argument that the county would consider amending the Plan to designate any facility that submitted a suitable bid. The district court will want to probe these conflicting indications on remand.

45

agreement, the County committed "not to adopt a new Plan or to amend the existing plan in such a manner as to reduce the existing service area of the Authority or to narrow the definition of municipal waste directed to the Authority, [the owner of the SECCRA facility]." SA 373, §6(a) [Amended and Restated Administrative Agreement].

The need to protect the county's financial interests thus appears to have played a role in the county's decision to adopt flow control. In this respect, this case closely resembles Carbone, where the Supreme Court found discriminatory Clarkstown's "avowed purpose . . . [of] retain[ing] the processing fees charged at the transfer station to amortize the cost of the facility." 104 S. Ct. at 1680.

3.  Summary

While the Act requires a fair, open and competitive process, and while the Committee did consider at least one out-of-state and several out-of-county sites, it appears that Chester County's designation process did not afford other sites, including out-of-state sites, a level playing field. Because, for the many reasons stated, the process appears to have been biased in favor of the Lanchester, SECCRA and Pottstown facilities, the Plan and its implementing ordinances might have the effect of discriminating against interstate commerce. Nevertheless, because the district court did not have the benefit of Atlantic Coast or of the clarifications we offer today, we will remand so that the district could may consider Chester County's flow control scheme in light of these principles. We

46

therefore reverse the judgment and remand for further proceedings consistent with this opinion.

B.  TRI-COUNTY INDUSTRIES, INC. V. COUNTY OF MERCER

The district court in the Western District of Pennsylvania found that the Mercer County flow control scheme enacted pursuant to the Act discriminated against interstate commerce and granted injunctive relief in favor of the plaintiff/hauler.  The district court opined:  "It is the designation of a single, in-state landfill, rather than the process by which it was designated, that has resulted in the discrimination against interstate commerce."  This conclusion is at odds with our conclusion that the focus should be on the designation process, on the reasonableness of the duration of the designation and on the practical likelihood of an amendment to designate an out-of-state facility.

Despite the erroneous legal standard used by the district court, we could affirm its decision if it appeared that these aspects of Mercer County's flow control scheme discriminated against interstate commerce.  But we are not convinced that the facts in the record can establish either that Mercer County's designation process was truly discriminatory, that the contractual tipping fee was unreasonable at the time the site was selected, or that there was insufficient likelihood of amendment to show that the scheme discriminated against out-of-state bidders.  For these reasons, and those explained infra, we must reverse and remand for further development of these aspects in order to gauge the real extent of the opportunity enjoyed by

47

out-of-state providers to participate in the Mercer County waste disposal market.

The Mercer County scheme resulted in the designation of a single site. Although the designated site is not located within Mercer County, it is in Pennsylvania. It is possible that the site's selection resulted from in-state prejudice. Because Carbone rejected the argument that a statute had to favor all in-state interests as a group in order to be discriminatory, the fact that Mercer's scheme allegedly favors only a single in-state site does not preclude a Commerce Clause challenge. Nevertheless, that only one in-state site has been selected under the county's designation process provides less evidence that the process has a discriminatory effect -- that is, that the process tends to select in-state sites -- than if a greater number of in-state sites had been selected in the designation process.

As with Harvey, the flow cr Discriminatory Effect

We still must directly address the question whether the selection criteria have the effect, irrespective of the County's intent or its economic interests, of favoring in-state interests. We emphasize that this case does not involve facial discrimination: the designation process set objective criteria to choose the facility. Moreover, the RFP requirements *appmpt to open its designation process to out-of-state sites. Unlike Atlantic Coast, where the scheme had the explicit goal of securing in-state disposal capacity, Mercer County officials testified that no preference was given to in-state or out-of-state facilities. And unlike Chester County, the county prepared detailed bid*

48

*specifications and advertised its RFP* nationwide. *Twenty three companies purchased the RFP package, including companies from Pennsylvania, Ohio, New York, Maryland, New Jersey, Minnesota and Louisiana. Only four companies submitted bids in response to the RFP, and they all had landfills in Pennsylvania. The appellee, Tri-County, was among the four which submitted bids. As the district court acknowledged:*

> *"[T]he failure of the Authority to designate an out-of-state disposal facility was not the result of discrimination. Rather, it was attributable to the failure of any out-of-state disposal facility to bid on the contract, and the evidence clearly established that the procedures followed by the Authority in selecting a disposal site were "fair, open and competitive," as required by Act 101.*

*Dist. Ct. Op. at 13. (citation omitted). These facts certainly suggest that the process was fair, open, and competitive. Nevertheless, on remand Tri-County may be able to identify specifications of the bid or decisional criteria with a discriminatory effect.*

### *2. Lack of Economic Interest*

*Because the county had a relatively small economic interest in the facilities economic performance (it received a $1 per ton surcharge on the waste dumped at the facility), the district court concluded that the ordinance did not foster economic protectionism. As we have seen, and as the district court recognized, that the ordinance serves legitimate local purposes, does not save Mercer County's flow control scheme if*

49

*it has the effect of favoring in-state interests. But the relative lack of economic interest refutes at least one basis for the argument that the designation process did not really offer a level playing field to out-of-state competitors.*

*3. Potential for Discriminatory Effect*

*We still must directly address the question whether the selection criteria have the effect, irrespective of the County's intent or its economic interests, of favoring in-state interests. We emphasize that this case does not involve facial discrimination: the designation process set objective criteria to choose the facility. Moreover, the RFP requirements applied* equally to all disposal facilities, irrespective of their location. While this provision appears to rule out special dispensations for in-state sites, it does not preclude the possibility that some of the requirements were in practice more burdensome for out-of-state interests. That a number of out of state companies requested the RFP package but that not a single out-of-state interest submitted a bid raises the concern that some aspect of the RFP discouraged out of state interests.

We recognize, of course, that there was a considerable attrition rate in this process overall, which may indicate that Mercer County's business was not terribly attractive to <u>any</u> landfill operator. Indeed, of the twenty-three companies (in- or out-of-state) who requested the package, only four submitted a bid. On this record, however, it is impossible to determine whether the bid requirements had -- or would tend to have -- a disparate effect on out-of-state businesses. On remand, the

50

district court might consider statistical or other evidence regarding the differential drop out rates of firms in this contested designation process and/or expert testimony on the issue whether any specific RFP requirement was in fact more costly or burdensome for an out-of-state site to comply with.

### 4. Amendment

It is important to note that Mercer's scheme would be less problematic if a realistic opportunity existed for an out-of-state landfill to compete for at least some of the county's business within a reasonable period, either because amendment to designate an additional site was more likely or because the contract period was not so long. Although the County did have the capacity to amend its Plan to designate an additional site[0], the County conceded that it probably did not have enough waste to justify adding another facility, especially since the county had been advised that it would be most efficient for it to use a single site. Dist. Ct. Op., Add. 32-33. The designation of the site in this case, therefore, effectively amounts to the grant of a monopoly for the period of the designation. Because the Act required the counties to secure ten-year access to disposal capacity, we will not attribute a discriminatory motive to the county's effective grant of a ten-year monopoly in this case.[0]

---

[0]Section 3 of the Ordinance No. 6-1991 provides: "All Municipal Waste shall be transported to and delivered to the Facility designated by MCSWA from time to time. . . ."

[0]Although we do not infer a discriminatory purpose from the length of the contractual period, we concede that this would be an easier case if the losers in the designation process were not precluded from the local market for ten years. Nevertheless, we cannot say, given the costs of constructing and operating

### 5. Economic Favoritism

The possibility still exists, however, that the county contracted for a tipping fee that was so high relative to the ten-year tipping fees (the rate that the parties would be willing to fix for the entire period) prevailing in the market at the time of contracting that it would suggest an attempt to confer some extraordinary, super-monopolistic profit on the chosen landfill operator. It is not clear whether, in addition to securing ten-year disposal capacity, the Act required the County to lock in a price as well. Regardless, we would not infer any discrimination from the County's desire to lock in the price unless it turns out that the price was unreasonable at the time the site was selected. Although the County appears to have made a "bad bet" on the price of long term waste disposal,[0] the market could just as easily have moved in the opposite direction and made county officials look financially savvy.[0] Indeed, the differential between the contracted tipping fee and the spot market is much smaller than it is in the Harvey case: the contractual tipping fee was $35 per ton relative to the spot rates of $17.20 at the American Waste Landfill or the $27.95 due at the Carbon Limestone Landfill.

---

environmentally sound facilities, that the ten-year period was unreasonable.
[0]Spot market tipping fees, fees charged to dump waste today only, have declined precipitously since the County made its contract with the facility in Butler County. Spot rates currently are apparently approximately $17.50 - $30.00 per ton.
[0]County officials apparently chose to lock in the tipping fee out of their concern that tipping fees would continue to escalate. See dist. ct. adjudication.

Appellees devote considerable effort to their attempts to demonstrate the less restrictive alternative means of ensuring long term environmentally safe waste disposal capacity.  We do not pass on the efficacy of these alternative strategies.  If the district court decides on remand that the Mercer County designation scheme has the effect of discriminating against out-of-state interests, it must then under the strict scrutiny standard address both the question whether the government interest is strong enough and whether less discriminatory means to achieve the same goal are available.

VI.  CONCLUSION

For the foregoing reasons, we will vacate the orders of the district courts in these two cases, and remand for further proceedings consistent with this opinion.  Parties to bear their own costs.

_____

Harvey v. County of Chester, No. 94-1924

Tri County v. County of Mercer, No. 94-3622

NYGAARD, Circuit Judge, dissenting.

In each of the two cases before us in this appeal, the majority reverses the district court and remands the cause for it to further scrutinize the designation process. I must respectfully dissent.

Discriminatory purpose or effect triggers heightened scrutiny. The outcome of a selection process, however open that process may be, can be discriminatory in its practical effect. Regardless of the designation process employed, in each case a designation was made in the context of a flow control scheme; in each case, that flow control designation constituted an impermissible discrimination against interstate commerce and by effect alone triggered heightened scrutiny. I would affirm the order in Tri-County, in which I conclude the district court properly applied heightened scrutiny. I would reverse the order in Harvey & Harvey, and remand to the district court for it to apply the heightened scrutiny standard, because it failed to do so, despite the discriminatory effect of the designation in the context of flow control.

54

The articles of commerce involved in these cases are both the waste itself and the disposal services it requires. "Solid waste, even if it has no value, is an article of commerce." Fort Gratiot Landfill v. Michigan Dep't of Natural Resources, 504 U.S. 353, 359, 112 S.Ct. 2019, 2023 (1992). Although the Supreme Court in Carbone suggested that "the article of commerce is not so much the solid waste itself, but rather the service of processing and disposing of it," C & A Carbone, Inc. v. Town of Clarkstown, N.Y., ___ U.S. ___, 114 S.Ct. 1677, 1682 (1992) (emphasis supplied), the Court has not eliminated consideration of waste as an article of commerce. Whether dealings between Pennsylvania generators of waste and out-of-state waste disposal service companies are "viewed as 'sales' of garbage or 'purchases' of transportation and disposal services, the commercial transactions unquestionably have an interstate character." Fort Gratiot, 504 U.S. at 359, 112 S.Ct. at 2023.

In Carbone the Supreme Court held that a flow control ordinance coupled with a designation discriminated in its effect because it allowed only the designated operator to provide waste services within the geographic limits of the municipality. In Carbone, the town of Clarkstown designated a single, in-state facility to provide initial processing services for waste; its designation was part of a flow control scheme, which required all to use the designated facility. The court found that "[t]he ordinance thus deprives out-of-state businesses of access to a local market." 114 S.Ct. at 1681. Likewise, in the cases before us, out-of-state providers of waste services cannot accept waste

55

or sell services except to the extent that waste would be delivered to a designated facility; flow control mandates that waste only be delivered to a designated facility.

As in the Carbone case, "the real question is whether the flow control ordinance is valid despite its undoubted effect on interstate commerce." Id. at 1682 (emphasis supplied).[0] And, again as in the Carbone case, "find[ing] that the ordinance discriminates against interstate commerce, we need not resort to the Pike test." Id.

Thus, heightened scrutiny must be applied in the cases before us, because, regardless of the process employed in selecting waste service providers, the effect discriminates against interstate commerce. The Supreme Court "interpret[s] the Commerce Clause to invalidate local laws that impose commercial barriers or discriminate against an article of commerce by reason of its origin or destination out of State." Id. (emphasis supplied).

Heightened scrutiny analysis dictates that "[d]iscrimination against interstate commerce in favor of local business or investment is per se invalid, save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." Carbone, 114 S.Ct. at 1683 (citing

---

[0]Significantly, the Carbone court did not engage in an analysis of the process by which the Clarkstown facility was selected. It looked only to effect.

56

_Maine v. Taylor_, 477 U.S. 131, 106 S.Ct. 2440 (1986)).° The _Carbone_ court specifically rejected the contentions of amici in that case that designation coupled with a flow control scheme fit into the narrow class of permissible discrimination. In _Carbone_, the amici "suggest[ed] that as landfill space diminishes and environmental cleanup costs escalate, measures like flow control become necessary to ensure the safe handling and proper treatment of solid waste. The teaching of our cases is that these arguments must be rejected absent the clearest showing that the unobstructed flow of interstate commerce itself is unable to solve the local problem." 114 S.Ct. at 1683.

Although assurance of ten years of disposal capacity for county waste and of the proper disposal of waste generated in a county are laudable goals, the designation of facilities under a flow control scheme may not be essential for the achievement of those goals. For example, the county might receive assurances of ten years of capacity from a few disposal facilities without then requiring all county-generated waste actually to be disposed of at those same specific facilities. The goal of providing ten years of disposal capacity need not require that each facility, to accept waste, must provide an assurance of ten years of capacity.° Like the municipality in _Carbone_, the county in each

_____

°Once "shown to discriminate against interstate commerce either on its face or in practical effect, the burden falls on the State to demonstrate both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means." _Maine_, 477 U.S. at 138, 106 S.Ct. at 2447 (internal quotations and citation omitted).
°To the extent that the county might be providing an exclusive franchise to accept waste as payment in exchange for the

57

of the cases before us has open to it "any number of nondiscriminatory alternatives for addressing the . . . problems alleged to justify the ordinance in question." Id.

As the holding of the Supreme Court in Carbone compels, the Tri-County district court applied the heightened scrutiny test upon finding that the Mercer County ordinance was discriminatory in its practical effect. The district court ruled in favor of Tri-County Industries, Inc., because the defendants failed to meet their burden of demonstrating the unavailability of nondiscriminatory alternatives. I would affirm the district court for the reasons it gave in its well-reasoned opinion. The Harvey & Harvey district court overlooked the discriminatory effect of designation in a flow control scheme. For that reason, it failed to require heightened scrutiny. I would reverse its holding that Pike scrutiny applied, and remand. Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847 (1970).

_____

assurance of ten years of capacity, the scheme of flow control coupled with designation would in essence constitute a county scheme to finance the capacity assurance received, providing as payment the granting of a monopoly and its concomitant profits and stability in exchange for the assurance. The permissibility of such an arrangement is highly doubtful.