<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 98-1999

              HOULTON CITIZENS' COALITION, ET AL.,

                    Plaintiffs, Appellants,

                               v.

                        TOWN OF HOULTON,

                      Defendant, Appellee.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF MAINE

          [Hon. Morton A. Brody, U.S. District Judge]

                             Before

                    Selya, Stahl and Lipez,
                                
                       Circuit Judges.
                                

    Robert M. Morris, with whom Steven R. Davis and Carton, Davis
& Morris, P.A. were on brief, for appellants.
    Michael E. Saucier, with whom Thompson & Bowie was on brief,
for appellee.

April 22, 1999

                                
                                

 SELYA, Circuit Judge.  This litigation has its genesis in
a waste management scheme devised by the town fathers of Houlton,
Maine (the Town).  The appellants claim that Houlton's plan   under
which the Town by contract designated a single firm as the
exclusive hauler of residential waste within its borders, and
enacted a flow-control ordinance directing all such waste either to
be collected by that firm or to be brought to its transfer station
 violates the Commerce Clause, the Takings Clause, the Contract
Clause, and the town charter.  The district court rejected these
importunings.  We affirm the judgment below (with a slight
modification), but our reasoning differs from the district court's
in respect to the principal bone of contention   the Commerce
Clause challenge.
I.  BACKGROUND
 As in many small towns across the nation, Houlton
residents traditionally dealt with solid waste by depositing it in
the town dump or engaging others to do so.  On October 17, 1995,
state environmental authorities closed the dump.  In order to
remain compliant with state law, the Town needed to fashion a new
way for its residents to deal with solid waste.  It thereupon
issued a request for proposals (RFP), conducted an open competitive
bidding process that resulted in the selection of a local firm
(Andino, Inc.) as its exclusive contractor, agreed to provide that
firm with a guaranteed trash quota for seven years, and enacted a
flow-control ordinance (the 1995 Ordinance) that required all
residential solid waste generated within the town limits to be
taken to a local transfer site operated by Andino.
 In New England, change does not come easily.  Asserting
that the 1995 Ordinance violated the Commerce Clause, David Condon,
a trash disposal operator, sued Andino and the Town.  The federal
district court preliminarily enjoined enforcement of the 1995
Ordinance, see Condon v. Andino, Inc., 961 F. Supp. 323, 331-32 (D.
Me. 1997), and the Town folded; instead of litigating to the bitter
end, it revised the law and enacted a new ordinance (the 1997
Ordinance) that put a somewhat different waste management system
into effect.
 The new plan has two components.  The first is the 1997
Ordinance itself.  The ordinance requires all generators of
residential rubbish within the Town either to use Houlton's chosen
contractor to transport their trash, or to haul it themselves.  See1997 Ordinance  10-507.  Although the Town's contractor is
permitted to dispose of collected trash at any proper disposal
site, residents who choose to self-haul are required to take their
refuse to a repository designated by the Town Council.  See id.  
10-504.  The ordinance provides fines and other penalties for
noncompliance.  See id.  10-503.
 The contract between Andino and the Town constitutes the
new scheme's second component.  The  previous contract between
these parties had included, inter alia, a failsafe clause whereby
the Town agreed to negotiate with Andino in good faith to keep it
as the Town's contractor if a court of competent jurisdiction held
the 1995 Ordinance invalid or unenforceable.  Purporting to honor
its commitment to renegotiate, the Town implemented the 1997
Ordinance by supplementing and amending the preexisting contract,
granting Andino the exclusive right to collect third-party
residential waste under the 1997 Ordinance, and designating its
transfer station as the disposal site for self-haulers.
 These modifications did not placate those who yearned for
simpler times.  Four plaintiffs combined to sue the Town in federal
district court.  They included Condon, two other local trash
haulers (William Faulkner and Fred Spellman), and the Houlton
Citizens' Coalition (HCC), an unincorporated nonprofit association
formed by Houlton residents.  Invoking federal question
jurisdiction, 28 U.S.C.  1331   there is no other readily apparent
jurisdictional basis   the plaintiffs challenged the 1997 Ordinance
under, inter alia, the Commerce Clause, the Takings Clause, and the
Contract Clause.  They also appended a supplemental state-law claim
under the town charter.  The district court rebuffed their attempt
to restrain implementation of the 1997 Ordinance pendente lite,
concluding that the plaintiffs were unlikely to prevail on the
merits.  See Houlton Citizens' Coalition v. Town of Houlton, 982 F.
Supp. 40, 46 (D. Me. 1997)(HCC I).  The court subsequently granted
summary judgment for the Town on the four claims with which we are
concerned.  See Houlton Citizens' Coalition v. Town of Houlton, 11
F. Supp.2d 105, 112 (D. Me. 1998) (HCC II).  This appeal followed.
II.  STANDING
    Before we consider the appellants' substantive arguments,
we pause to ponder a potential problem:  the claim that the
Coalition, an unincorporated nonprofit association that was formed,
according to the uncontradicted affidavit of its president,
specifically "to provide a forum for research, analysis, discussion
and public education of civic policy issues related to the public
administration of the Town of Houlton, Maine" and "to perform civic
public service in this role," lacks standing.  See United States v.
AVX Corp., 962 F.2d 108, 113-16 (1st Cir. 1992) (discussing
elements of standing requirement for unincorporated associations).
    The Town brings some heavy artillery to this battlefield.  
Two respected courts recently have held that individual garbage
generators lacked standing to challenge schemes similar to
Houlton's under the Commerce Clause.  See Ben Oehrleins & Sons &
Daughter, Inc. v. Hennepin County, 115 F.3d 1372, 1381-82 (8th
Cir.), cert. denied, 118 S. Ct. 629 (1997); Individuals for
Responsible Gov't, Inc. v. Washoe County, 110 F.3d 699, 703-04 (9th
Cir.), cert. denied, 118 S. Ct. 411 (1997).  These courts
emphasized that the purpose of the dormant Commerce Clause is to
curtail states' abilities to hinder interstate trade, and that the
injury claimed by the individual garbage generators   being
compelled to pay higher prices for services they neither required
nor desired   was not even marginally related to this purpose.  SeeBen Oehrleins, 115 F.3d at 1382; Washoe County, 110 F.3d at 703.
    The HCC shares many attributes with the parties found to
lack standing in Ben Oehrleins and Washoe County.  It is made up of
individual trash generators who complain that under the 1997
Ordinance they will be forced to contract with Andino, when
previously they could patronize other haulers (presumably at lower
prices or on more felicitous terms).  Despite this parallelism,
however, we need not decide whether we share the outlook of the Ben
Oehrleins and Washoe County courts.  It is a settled principle that
when one of several co-parties (all of whom make similar arguments)
has standing, an appellate court need not verify the independent
standing of the others.  See Clinton v. City of New York, 118 S.
Ct. 2091, 2100 n.19 (1998); Bowsher v. Synar, 478 U.S. 714, 721
(1986); Montalvo-Huertas v. Rivera-Cruz, 885 F.2d 971, 976 (1st
Cir. 1989).  We take refuge behind this principle today.
    Here, Faulkner, a co-plaintiff, satisfies both the
constitutional requirements and the prudential conditions for
standing.  He has lost the business of his residential customers in
Houlton; that injury can be traced directly to the Town's neoteric
waste management scheme; and the injury would be adequately
redressed by equitable relief and/or damages against the Town.  As
a classic plaintiff asserting his own economic interests under the
Commerce Clause   a constitutional provision specifically targeted
to protect those interests   Faulkner avoids any concerns relative
either to jus tertii, see Warth v. Seldin, 422 U.S. 490, 499
(1975), or to the zone of interests requirement, see Valley Forge
Christian College v. Americans United for Separation of Church and
State, Inc., 454 U.S. 464, 475 (1982).
    We note, moreover, that Faulkner's claim to standing is
not damaged because he failed to allege that he hauled garbage out-
of-state or planned to do so.  In Commerce Clause jurisprudence,
cognizable injury is not restricted to those members of the
affected class against whom states or their political subdivisions
ultimately discriminate.  See General Motors Corp. v. Tracy, 519
U.S. 278, 286 (1997).  Thus, an in-state business which meets
constitutional and prudential requirements due to the direct or
indirect effects of a law purported to violate the dormant Commerce
Clause has standing to challenge that law.  See id. at 286-87
(collecting cases); see also Ben Oehrleins, 115 F.3d at 1379
(affirming district court's finding of standing for in-state
haulers and landfill operators).
    That ends this phase of our inquiry.  Because Faulkner
has standing to challenge the 1997 Ordinance, we need not decide
whether the HCC has standing to mount a challenge in its own right.

III.  ANALYSIS
    The appellants find four fatal flaws in the Town's waste
management scheme:  (1) it insults the dormant Commerce Clause; (2)
it takes private property without just compensation; (3) it
impermissibly burdens contracts; and (4) its implementation by the
Town violates the municipal charter.  Only the first of these
contentions demands extended discussion.
    The first order of business requires us to remark the
underlying legal standard.  This appeal emanates from an order
granting summary judgment.  We have written extensively about that
procedural device, see, e.g., McCarthy v. Northwest Airlines, Inc.,
56 F.3d 313, 314-15 (1st Cir. 1995) (collecting cases), and we need
only sketch the parameters here.
    A district court may enter summary judgment upon a
showing "that there is no genuine issue as to any material fact and
that the moving party is entitled to a judgment as a matter of
law."  Fed. R. Civ. P. 56(c).  In this instance, the district court
found that the Town had made such a showing and granted its motion
for brevis disposition on all counts.  We review orders for summary
judgment de novo, considering the record and all reasonable
inferences therefrom in the light most hospitable to the summary
judgment loser.  See Mullin v. Raytheon Co., 164 F.3d 696, 698 (1st
Cir. 1999).  This standard of review permits us to embrace or
reject the rationale employed by the lower court and still uphold
its order for summary judgment.  In other words, we may affirm such
an order on any ground revealed by the record.  See Hachikian v.
FDIC, 96 F.3d 502, 504 (1st Cir. 1996); Mesnick v. General Elec.
Co., 950 F.2d 816, 822 (1st Cir. 1991).  With this brief preface,
we turn to the substance of the appellants' asseverations.
               A.  The Commerce Clause Challenge.
    In terms, the Constitution empowers Congress "[t]o
regulate Commerce . . . among the several states."  U.S. Const. art
I,  8, cl. 3.  Over time, courts have found a negative aspect
embedded in this language   an aspect that prevents state and local
governments from impeding the free flow of goods from one state to
another.  This has come to be known as the "dormant Commerce
Clause."  The dormant Commerce Clause does not affect state or
local regulations directly authorized by Congress, see Southern
Pac. Co. v. Arizona ex rel. Sullivan, 325 U.S. 761, 769, (1945),
but, rather, acts as a brake on the states' authority to regulate
in areas in which Congress has not affirmatively acted, see Camps
Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 571
(1997).  If a state or local government enters such uncharted
waters and enacts a law that unduly favors in-state commercial
interests over their out-of-state counterparts, that law
"routinely" will be defenestrated under the dormant Commerce Clause
"unless the discrimination is demonstrably justified by a valid
factor unrelated to economic protectionism."  West Lynn Creamery,
Inc. v. Healy, 512 U.S. 186, 192-93 (1994).
    The case at hand involves the application of the dormant
Commerce Clause to a municipal waste management scheme.  While the
issue is one of first impression in this circuit, we come upon the
scene finding the legal landscape already considerably cluttered.  
The Supreme Court has dealt with quandaries of this general kind
several times in the last decade.  See C & A Carbone, Inc. v. Town
of Clarkstown, 511 U.S. 383 (1994); Oregon Waste Sys., Inc. v.
Department of Envtl. Quality, 511 U.S. 93 (1994); Fort Gratiot
Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources, 504
U.S. 353 (1992); Chemical Waste Mgmt., Inc. v. Hunt, 504 U.S. 334
(1992).  Clarkstown is both the most recent and the most relevant
of these precedents, and we use it as a point of departure to put
into perspective the precise issue that confronts us.
    After the closing of its municipal landfill and the entry
of a consent decree with New York's Department of Environmental
Conservation, Clarkstown found itself in a situation similar to
that of Houlton.  See Clarkstown, 511 U.S. at 386-87.  In response,
the town contracted with a commercial entity to build a transfer
station within its borders (the Route 303 station), retaining the
right to purchase the transfer station for a nominal sum after five
years.  See id. at 387.  Clarkstown financed construction of the
Route 303 station by guaranteeing that a set level of trash would
be brought there and establishing above-market "tipping fees" to be
paid by garbage disposers.  See id.  In order to ensure the
fulfillment of this self-imposed quota, Clarkstown passed a flow-
control ordinance directing that all waste within its borders be
disposed of at the Route 303 station.  See id.  In defiance of this
directive, Carbone (a local trash hauler) transported waste from
Clarkstown to out-of-state landfills without passing it through the
Route 303 station and without paying tipping fees there.  See id.at 387-88.  Clarkstown sought an injunction, and Carbone defended
on Commerce Clause grounds.
    The New York courts ruled that the flow-control ordinance
passed constitutional muster.  See Town of Clarkstown v. C & A
Carbone, Inc., 587 N.Y.S.2d 681, 687-88 (App. Div.), appeal denied,
591 N.Y.S.2d 138 (1992).  The United States Supreme Court thought
otherwise.  It reversed, holding the ordinance unconstitutional.  
See Clarkstown, 511 U.S. at 394-95.  We find the architecture of
the Court's dormant Commerce Clause analysis instructive.
    The Court first addressed the threshold question of
whether the challenged ordinance discriminated on its face against
interstate commerce (as opposed to regulating commerce evenhandedly
with only incidental effects on interstate commerce).  See id. at
390; id. at 402 (O'Connor, J., concurring).  It noted that an
ordinance that discriminates on its face against interstate
commerce and in favor of local businesses is per se invalid, "save
in a narrow class of cases in which the municipality can
demonstrate, under rigorous scrutiny, that it has no other means to
advance a legitimate local interest."  Id. at 392.  The Court
further explained that if an ordinance is not discriminatory on its
face, a balancing test must then be performed to determine its
constitutionality.  See id. at 390.  Viewed in this less intense
light, the ordinance will stand unless the burden that it places
upon interstate commerce is "clearly excessive in relation to the
putative local benefits."  Id. (quoting Pike v. Bruce Church, Inc.,
397 U.S. 137, 142 (1970)).
    Using these criteria, the Court adjudged Clarkstown's
flow-control ordinance discriminatory on its face; the ordinance
achieved its goal of providing the refuse necessary to finance the
Route 303 station "by depriving competitors, including out-of-state
firms, of access to a local market."  Id. at 386.  For this reason,
Justice Kennedy, writing for the majority, classified the ordinance
as merely another example of the type of local processing
requirement that the Court had invalidated with monotonous
regularity, observing that Clarkstown's scheme attempted to hoard
solid waste, just as states and municipalities in prior cases had
attempted to hoard other commodities for processing by local, as
opposed to out-of-state, interests.  See id. at 391-92.  To
illustrate the point, the Court cited, inter alia, earlier
decisions striking down schemes to "hoard"  timber, South-Central
Timber Dev., Inc. v. Wunnicke, 467 U.S. 82 (1984), milk, Dean Milk
Co. v. Madison, 340 U.S. 349 (1951), and meat, Minnesota v. Barber,
136 U.S. 313 (1890).
    In the jurisprudence of the dormant Commerce Clause, a
finding of facial discrimination is almost always fatal.  
Clarkstown proved no exception.  Though the municipality's
interests in the efficient processing and disposal of solid waste
and in financing its transfer station were legitimate concerns, the
Court abrogated the flow-control ordinance because those goals
could have been pursued through nondiscriminatory alternatives.  
See Clarkstown, 511 U.S. at 393.
    Our sister circuits have glossed the lessons of
Clarkstown somewhat differently.  In SSC Corp. v. Town of
Smithtown, 66 F.3d 502 (2d Cir. 1995), the Second Circuit
considered a binary waste management scheme consisting of (a) a
flow-control ordinance that required all municipal waste to be
disposed of at a facility designated by the town, see id. at 507,
and (b) a series of contracts with a discrete group of haulers for
particular areas of the town, in which Smithtown granted each
hauler an exclusive franchise for a specific area, required
disposal at the town's designated site, and financed the hauling
contracts through tax assessments, see id. at 507-08.  The court
found the scheme's first facet unconstitutional, believing that
Clarkstown compelled it to nullify the ordinance "because it
directs all town waste to a single local disposal facility, to the
exclusion of both in-state and out-of-state competitors."  Id. at
514.  The court nevertheless approved the scheme's second facet,
validating the town's use of exclusive hauling contracts under the
dormant Commerce Clause's market participant exception.  See id. at
514-18; see generally Hughes v. Alexandria Scrap Corp., 426 U.S.
794, 810 (1976) (holding that a state or municipality is outside
the purview of the dormant Commerce Clause   and thus may tilt in
favor of local businesses   when it enters a market as a
participant rather than as a regulator).
    On the same day it decided Smithtown, the Second Circuit
also decided USA Recycling, Inc. v. Town of Babylon, 66 F.3d 1272
(2d Cir. 1995).  As part of its solid waste plan, Babylon had
entered an exclusive service agreement with a single hauler (BSSCI)
to remove all commercial waste and simultaneously had precluded the
licensing of other haulers.  See id. at 1278-79.  The town allowed
BSSCI to dispose of the trash that it collected without charge at
a municipally-owned, but privately-operated, incinerator.  See id.at 1277-79.  Moreover, it paid both BSSCI and the incinerator
operator with public funds.  See id.
    The court held that Babylon's scheme did not discriminate
on its face against interstate commerce, but merely eliminated the
commercial market for garbage collection services, substituting for
it the town's provision of those services through a private
contractor.  See id. at 1283.  The court also held that Babylon's
grant of an exclusive franchise and free disposal rights to its
chosen contractor constituted market participation, exempt from the
requirements of the dormant Commerce Clause.  See id. at 1288-89.
    In the dim afterlight of Clarkstown, another court of
appeals has spoken on the subject of flow control and the dormant
Commerce Clause.  See Harvey & Harvey, Inc. v. County of Chester,
68 F.3d 788 (3d Cir. 1995).  Acting pursuant to state law, the
county commissioners of Chester, Pennsylvania, adopted a solid
waste plan and a flow-control ordinance.  See id. at 794.  The
ordinance created two service areas and required all garbage in
each area to go to a designated landfill within that area (save
only for a certain amount of waste allocated to a third in-state
landfill nearby).  See id. at 794-95.  Harvey & Harvey, Inc., an
interstate hauler and processor, challenged the plan under the
dormant Commerce Clause.  The district court ruled that the plan
did not discriminate on its face against interstate commerce and
that application of the Pike balancing test was warranted.  See id.at 795.  Because Harvey & Harvey conceded that it could not prove
its case under that standard, the court entered judgment for the
defendant.
    On appeal, the Third Circuit acknowledged that, under
Clarkstown, a flow-control ordinance favoring a single in-state
operator over all other in-state and out-of-state operators might
be vulnerable to attack under the dormant Commerce Clause.  See id.at 798.  Still, the court observed that not all such ordinances
would suffer such a fate.  See id.  Similarly, "[t]hat [an]
ordinance requires the use of [a] selected facility, thus
prohibiting the use of non-designated facilities (which may be out
of state), does not itself establish a Commerce Clause violation."  
Id.  Thus, although the grant of an exclusive contract to a local
waste hauler/processor is suspect, it is not a per se violation of
the dormant Commerce Clause.  See id. at 801.
    The Third Circuit then explained that, to secure a
finding of discrimination vis--vis a flow-control scheme that
excludes all out-of-state haulers and/or processors and most in-
state haulers and/or processors, the challenger must show that
those excluded did not have a fair opportunity to obtain the town's
custom.  If the playing field is level for both in-state and out-
of-state bidders, such parity ordinarily will satisfy the
constitutional imperative.  See id. at 802.  Under this standard,
"a local authority could choose a single provider   without
impermissibly discriminating against inter-state commerce   so long
as the selection process was open and competitive and offered truly
equal opportunities to in- and out-of-state businesses."  Id.  The
court of appeals then asked the district court to reconsider Harvey
& Harvey's plaint in light of the newly articulated standard.  Seeid. at 807.
    Against this backdrop, we inquire whether the 1997
Ordinance enacted by the Houlton Town Council discriminates on its
face against interstate commerce.  Like Clarkstown's ordinance, the
challenged ordinance and the contract granted ancillary to it
funnel all residential waste through a single contractor.  Because
of that similarity, the appellants chant the Clarkstown catechism,
claiming that Houlton's scheme "deprives out-of-state businesses of
access to a local market," Clarkstown, 511 U.S. at 389, and thereby
"discriminates, for it allows only the favored operator to process
waste that is within the limits of the town," id. at 391.  Houlton
dismisses the analogy to Clarkstown.  In its view, the more apt
analogy is to Smithtown's second facet because Houlton, like
Smithtown, became the only buyer in the local garbage market by
means of the 1997 Ordinance and, acting as a market participant,
hired Andino to service its garbage needs.  Alternatively, the Town
compares its position to Babylon's because it took over the garbage
collection market while acting as a regulator, and then privatized
its own provision of collection services, acting as a market
participant.
    This last argument proved persuasive below.  Following
the Babylon court's lead, the district judge considered the two
parts of Houlton's waste management scheme separately.  Initially,
he ruled that the 1997 Ordinance constituted market regulation and,
like Babylon's ordinance, served merely  to eliminate the private
sector from the garbage collection business.  See HCC I, 982 F.
Supp. at 43-44.  Still concentrating on the ordinance, the judge
noted that Houlton had become "the lone provider of [collection]
services and ha[d] hired Andino to furnish these services on its
behalf subject to the Town's supervision and control."  Id. at 45.  
On this basis, he concluded that the 1997 Ordinance did not
facially discriminate against interstate commerce.  See id. at 46.  
Finally, he performed the requisite balancing test and declared the
ordinance constitutional.  See id.
    The judge also considered the Town's contract with Andino
and found that, under this contract, "Houlton is acting as a
'buyer' in the garbage collection, disposal, and processing
markets, and enters those markets 'with the same freedoms and
subject to the same restrictions as a private party.'"  Id. at 44
(quoting Smithtown, 66 F.3d at 509).  Because the Town acted as a
market participant in dealing with Andino, the judge concluded, the
contract between the two escapes scrutiny under the dormant
Commerce Clause.  See id.
    For two reasons, we are reluctant to place our imprimatur
on the district court's bifurcated analysis.  First, Smithtown and
Babylon are cutting-edge decisions, and it is unclear to us whether
or not the Supreme Court eventually will adopt their ratiodecidendi.  Second, and perhaps more important, although Houlton's
waste management scheme shares some features of the Smithtown and
Babylon schemes, it differs significantly in requiring that those
municipal residents who do not choose to tote their own garbage
contract individually with the Town's designated hauler for the
purpose of removing residential refuse. See 1997 Ordinance  10-
507(1).  Moreover, even self-haulers are required to use a
designated transfer station.  See id.  10-504.  The ordinance thus
explicitly creates forced business transactions   an element that
was present in Clarkstown, but lacking in the Second Circuit cases
(both of which involved arrangements that avoided forced
transactions by the simple expedient of appropriating tax dollars
to fund waste management services).  This distinction cannot be
disregarded, for the Second Circuit's market participation analysis
in Smithtown and its finding of nondiscrimination in Babylon were,
at least to some extent, dependent on those communities'
expenditures of public funds in support of their contractual
arrangements.  See Smithtown, 66 F.3d at 515 (noting that
"Smithtown is spending tax dollars to pay for both [waste
collection and disposal] services"); Babylon, 66 F.3d at 1283
(distinguishing Clarkstown on the ground that "the payment of taxes
in return for municipal services is not comparable to a forced
business transaction").
    We need not probe this point too deeply, however, for the
case at hand can be resolved in a more straightforward fashion.  We
do not interpret Clarkstown as explicating a broad-based ban on
every flow-control ordinance that happens to be coupled with an
exclusive contractual arrangement in favor of an in-state operator.  
To suggest that every such ordinance violates Clarkstown would
stretch both Justice Kennedy's language and the logic of the
dormant Commerce Clause past the breaking point.
    The core purpose of the dormant Commerce Clause is to
prevent states and their political subdivisions from promulgating
protectionist policies.  See, e.g., Camps Newfound/Owatonna,  520
U.S. at 578 (citing "economic isolationism" as "the very evil that
the dormant Commerce Clause was designed to prevent"); New Energy
Co. v. Limbach, 486 U.S. 269, 273-74 (1988) (explaining that the
"'negative' aspect of the Commerce Clause prohibits economic
protectionism   that is, regulatory measures designed to benefit
in-state economic interests by burdening out-of-state
competitors"); see also Clarkstown, 511 U.S. at 390 ("The central
rationale for the rule against discrimination is to prohibit state
or municipal laws whose object is local economic protectionism,
laws that would excite those jealousies and retaliatory measures
the Constitution was designed to prevent.").  It follows,
therefore, that if local legislation leaves all comers with equal
access to the local market, it does not offend the dormant Commerce
Clause.  See CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 94
(1987); Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 471-72
(1981); Harvey & Harvey, 68 F.3d at 802.  In other words, to the
extent that in-state and out-of-state bidders are allowed to
compete freely on a level playing field, there is no cause for
constitutional concern.
    It is a logical next step that when the Commerce Clause
inquiry focuses on a state or local plan that culminates in an
award of an exclusive contract to one of several aspirants (actual
or potential), the process by which the contractor is chosen
assumes great importance in determining the plan's
constitutionality vel non.  See Harvey & Harvey, 68 F.3d at 801.  
After all, in-state interests are not unduly pampered, nor out-of-
state competitors unduly burdened, when a municipality awards an
exclusive contract to a low bidder (from whatever state or region)
after a fair and  open bidding process.  In such circumstances,
unrestricted access to the bidding process constitutes unrestricted
access to the relevant market.
    Applying this tenet, Houlton's 1997 Ordinance does not
flout the dormant Commerce Clause.  Andino did not become the
Town's contractor in a backroom deal, cutting potential competitors
off at the pass, but, rather, earned the Houlton contract through
its successful completion of a well-advertised, fully competitive
bidding process that was accessible to all who coveted the
business.  The Town issued a detailed RFP after holding a widely
publicized meeting, open to all prospective bidders, at which such
prospective bidders were able to comment on, and ask questions
about, the project.  The record contains no hint that the Town
restricted the bid protocol to a particular class of bidders,
shaped it to favor in-state operators, or slanted it in any way
against out-of-state purveyors.  The RFP itself includes no terms
that either give in-state operators a leg up or disadvantage their
out-of-state rivals.
    In point of fact, the RFP allows any bidder willing and
able to haul and dispose of Houlton's trash to submit a proposal.  
It does not lock bidders into using a particular transfer station;
on the contrary, its terms permit the successful bidder to contract
with whomever the bidder chooses (in-state or out-of-state) to
process the garbage and effectuate disposal at any lawful site
within or without the state.  Furthermore, the RFP  specifically
notes that bidders may request deviations or file alternative
proposals.
    In response to the RFP, the  Town received multiple bids.  
It awarded the contract to Andino   the low bidder.  The contract's
seven-year term, though lengthy, does not seem excessive
considering the relatively substantial commitment of equipment and
other resources required on the successful bidder's part   and
nothing about this duration impacts out-of-state operators
differently than their in-state competitors.  In short, this open
and freely accessible bidding process ensured a level playing field
for all interested parties and provided sufficiently broad market
access to quell Commerce Clause concerns.  Consequently, the Town's
garbage disposal scheme does not constitute a per se violation of
the dormant Commerce Clause, but instead regulates commerce
evenhandedly, with no more than incidental effects on interstate
trade.
    This brings us to the balancing test.  Under this test,
we must uphold the 1997 Ordinance "unless the burden imposed on
[interstate] commerce is clearly excessive in relation to the
putative local benefits."  Pike, 397 U.S. at 142.  In light of the
strong local interest in efficient and effective waste management
and the virtually invisible burden that the Town's scheme places on
interstate commerce, Houlton passes this test with flying colors.  
See generally Northwest Cent. Pipeline Corp. v. State Corp. Comm'n,
489 U.S. 493, 525-26 (1989); Arkansas Elec. Coop. Corp. v. Arkansas
Pub. Serv. Comm'n, 461 U.S. 375, 394-95 (1983).  Hence, the
district court did not err in entering summary judgment against the
appellants on their Commerce Clause claim.
                    B.  Remaining Arguments.
    The appellants' three remaining arguments need not detain
us.  We note briefly why we regard two of them as unavailing, and
why we conclude that the third should be left to the state courts.
    1.  The Takings Clause.  The Fifth Amendment's mandate
that private property shall not be taken for public use without
just compensation applies to the states and their political
subdivisions through the Fourteenth Amendment.  See Chicago,
Burlington & Quincy R.R. Co. v. Chicago, 166 U.S. 226, 239 (1897).  
This protection is not restricted to physical invasions,
occupations, or removals of property; in some cases, overly
assiduous government regulation can create an unconstitutional
taking.  Whether a particular restriction implicates the Takings
Clause is context-sensitive and hinges on the specific
circumstances.  See Penn Cent. Transp. Co. v. New York City, 438
U.S. 104, 124 (1978); United States v. Central Eureka Mining Co.,
357 U.S. 155, 168 (1958).  In mounting such inquiries, courts must
weigh especially the character of the government action, its
economic impact on the plaintiff, and the degree to which it
interferes with the plaintiff's reasonable, investment-backed
expectations.  See Philip Morris, Inc. v. Harshbarger, 159 F.3d
670, 674 (1st Cir. 1998).
    Faulkner perceives a regulatory taking in this case
because, after operating his trash-collecting business in Houlton
for many years unfettered by municipal tethers, the passage of the
1997 Ordinance curbed his activities and dried up a significant
income stream.  But this argument swims against a powerful tide:  
courts steadfastly have rejected the proposition that the grant of
an exclusive contract for refuse collection constitutes a taking
vis--vis other (competing) trash haulers.  See California
Reduction Co. v. Sanitary Reduction Works, 199 U.S. 306, 321-323
(1905); Gardner v. Michigan, 199 U.S. 325, 330-31 (1905); Tri-State
Rubbish, Inc. v. Waste Mgmt., Inc., 998 F.2d 1073, 1082 (1st Cir.
1993).  Since we have no reason to question the continuing vitality
of this impressive string of cases, we affirm the district court's
grant of summary judgment in favor of the defendant on the takings
claim.
    2.  The Contract Clause.  The Contract Clause declares
that:  "No State shall . . . pass any . . . Law impairing the
Obligation of Contracts."  U.S. Const. art. I,  10, cl. 1.  
Despite the majestic sweep of this language, the Contract Clause is
not energized unless a contractual relationship exists, that
relationship is impaired by a change in the law, and the resultant
impairment is substantial.  See General Motors Corp. v. Romein, 503
U.S. 181, 186 (1992); McGrath v. Rhode Island Retirement Bd., 88
F.3d 12, 16 (1st Cir. 1996).  The first two parts of this inquiry
are, as in this case, often easily satisfied.  Faulkner enjoyed
garbage collection contracts with approximately 75 Houlton
residents, and the 1997 Ordinance effectively prevents him from
fulfilling those contracts.  Thus, the controlling question is
whether this impairment should be regarded as substantial.
    In order to weigh the substantiality of a contractual
impairment, courts look long and hard at the reasonable
expectations of the parties.  In this inquiry, it is especially
important whether the parties operated in a regulated industry.  
See Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459
U.S. 400, 413 (1983); Mercado-Boneta v. Administracion del Fondo de
Compensacion al Paciente, 125 F.3d 9, 13 (1st Cir. 1997).  While
Faulkner and his garbage collection customers did business for many
years uninhibited by any regulation precisely akin to the 1997
Ordinance, they would have had to be troglodytes not to have known
that the waste collection and disposal industry is subject to
fairly pervasive regulation.  See, e.g., Clarkstown, 511 U.S. at
386 (collecting recent Supreme Court cases dealing with the
validity of various aspects of such regulation).  Indeed, Houlton's
foray into flow control was prompted by the continued regulatory
efforts of the State of Maine.  In this vein, while the 1995
Ordinance eventually proved abortive, it plainly adumbrated for
Faulkner and his customers that change was in the wind.  The
general condition of regulation in the waste management industry
and the specific foreshadowing provided by Houlton's action in 1995
should have led Faulkner to realize that his collection contracts
could not be maintained ad infinitum.
    Viewed through this prism, the question whether the
impairment worked by the 1997 Ordinance meets the test of
substantiality is close.  We need not decide that close question,
however, for even a state law that creates a substantial impairment
does not transgress the Contract Clause as long as it is
appropriate for, and necessary to, the accomplishment of a
legitimate public purpose.  See Energy Reserves, 459 U.S. at 412;
Mercado-Boneta, 125 F.3d at 15.  "The requirement of a legitimate
public purpose guarantees that the State is exercising its police
power, rather than providing a benefit to special interests."  
Energy Reserves, 459 U.S. at 412.  The 1997 Ordinance addresses
itself specifically to "ensur[ing] reliable provision of collection
and hauling services which will further the interest of public
health and safety."  1997 Ordinance (preamble).  Health and safety
are two mainstays of the police power.  See, e.g., Allied
Structural Steel Co. v. Spannaus, 438 U.S. 234, 241 (1978).  Thus,
this stated purpose and the ordinance's goal to achieve economies
of scale for the benefit of Houlton's residents, see 1997 Ordinance
(preamble), fit well within the category of remedies for "broad and
general social or economic problem[s]" that the Supreme Court has
stated will meet its criteria of legitimacy in a Contract Clause
context, Energy Reserves, 459 U.S. at 412.
    Upon finding a legitimate public purpose, the next step
ordinarily involves ascertaining the reasonableness and necessity
of the adjustment of contract obligations effected by the
regulation to determine finally whether the regulation offends the
Contract Clause.  See id.; Mercado-Boneta, 125 F.3d at 15.  Withal,
an exception to this rule exists when the contracts at issue are
private and no appreciable danger exists that the governmental
entity is using its regulatory power to profiteer or otherwise
serve its own pecuniary interests.  In such instances, a court
properly may defer to the legislature's judgment.  See Energy
Reserves, 459 U.S. at 413; Mercado-Boneta, 125 F.3d at 15.  So it
is here:  by enacting the 1997 Ordinance, the Town has reshaped the
conduct of waste removal within its borders, but has not altered
its own fiscal obligations.  The waste management system   
collectively, the ordinance and the contract entered into pursuant
to it   neither requires the outlay of public funds nor relieves
the Town's coffers of any financial burdens.  Accordingly, we defer
to the Town Council's judgment that the system it created through
the 1997 Ordinance is a moderate course designed to achieve the
permissible purposes stated in the ordinance's preamble.  Because
the 1997 Ordinance, so viewed, is reasonable in light of the
circumstances, see Mercado-Boneta, 125 F.3d at 15, the district
court did not err in resolving the Contract Clause claim against
the plaintiffs.
    3.  The Town Charter.  The appellants do not dispute that
the initial contract between Andino and the Town was secured
through a fair and open competitive bidding process in which Andino
was the successful low bidder.  This process was mandated by, and
fully conformed to, the requirement that "[a]ll purchases by the
Town of property, services, and contract rights which exceed five
thousand dollars ($5,000.00) shall be conducted by sealed,
competitive bidding."  Houlton Town Charter  512,  3.  They
assert, however, that the Town violated the charter when it
renegotiated Andino's contract to bring it in line with the 1997
Ordinance.  The district court rejected this assertion, holding
that there was no need for a new round of bidding, and that the
renegotiated contract was valid.  See HCC II, 11 F. Supp.2d at 111-
12.
    We think that this scenario presents a close question of
state law   and one that the district court did not need to reach.  
After all, the district court had no independent jurisdiction over
the town charter claim; and, although 28 U.S.C.  1367 allows a
district court that has jurisdiction over a series of federal
claims to entertain related state-law claims that "form part of the
same case or controversy," id., it does not oblige the court to
continue with those claims if, prior to trial, it disposes of the
federal claims.  Where, as here, the federal claims upon which the
court's jurisdiction depends are resolved before trial, section
1367 confers upon the judge the authority to dismiss a supplemental
state-law claim without prejudice.  See Rodriguez v. Doral Mortgage
Corp., 57 F.3d 1168, 1177 (1st Cir. 1995); Martinez v. Colon, 54
F.3d 980, 990 (1st Cir. 1995).
    In this instance, the town charter claim is not only
difficult, but also novel as a matter of state law.  The litigation
was in the early stages.  Under the circumstances, we conclude that
dismissal without prejudice clearly was the option of choice, and
that the district court should not have ventured to adjudicate the
town charter claim.  See Rodriguez, 57 F.3d at 1177 (admonishing
that "a federal court may be wise to forgo the exercise of
supplemental jurisdiction when the state law that undergirds the
nonfederal claim is of dubious scope and application"); see also 28
U.S.C.  1367(c)(1).
IV.  CONCLUSION
    We need go no further.  The Town of Houlton's adoption of
a flow-control ordinance, coupled with its grant of an exclusive
hauling and disposal contract to a local contractor, does not
discriminate on its face against interstate commerce because both
in-state and out-of-state providers were allowed to compete for
this contract on the same footing.  Moreover, since any incidental
effects that this waste management scheme may have on interstate
commerce correspond to legitimate local interests in efficiency and
public health, the plan does not violate the dormant Commerce
Clause.  By like token, it does not work an unconstitutional taking
or impermissibly impugn private contracts.  Finally, because the
town charter claim depends entirely on state law, we think that the
better course is to leave that claim to be litigated in the state
courts (should the appellants choose to press it).  We therefore
direct the district court to modify its judgment to provide that
the appellants' claim under the Houlton Town Charter is dismissed
without prejudice.

Affirmed as modified.  Costs in favor of the appellee.

</body>

</html>